**UTILITY CONTRACTORS, INC., Plaintiff,**

v.

**The UNITED STATES, Defendant.**

No. 416–82C.

United States Claims Court.

April 22, 1985.

Peter J. O'Loughlin, Houston, Tex., for plaintiff.

R. Anthony McCann, Washington, D.C., with whom was Asst. Atty. Gen. J. Paul McGrath, Washington, D.C., for defendant.

## OPINION

### MOODY R. TIDWELL, III, Judge:

This is a government contract case which comes before the court pursuant to the Contract Disputes Act of 1978. Plaintiff seeks $1,743,366 on three alternative theories for reimbursement of increased costs resulting from water damage to permanent work on the "Joe Creek" Canal Lining Project. Defendant filed a Motion for Summary Judgment on all three counts which is opposed by plaintiff. Thereafter, plaintiff filed a Partial Cross-Motion for Summary Judgment on Count III of its Complaint, which defendant opposed. Oral argument was heard on both motions. After careful consideration of the documentary evidence and oral arguments, the court grants Defendant's Motion for Summary Judgment and denies Plaintiff's Partial Cross-Motion for Summary Judgment on Count III of the Complaint.

## FACTS

Plaintiff, Utility Contractors, Inc., is a Kansas corporation with principle offices in Wichita, Kansas. On February 16, 1978 defendant, through the Corps of Engineers, awarded formally-advertised Contract No. DACW 56–78–C–0073 to plaintiff for the construction of approximately a two and one-half mile span of channel lining and other improvements on Joe Creek in Tulsa, Oklahoma.

The project was the result of several years of extensive studies by the Corps beginning in 1969, the purpose of which was to eliminate flood damage which occurred periodically during severe rainstorms. The project was intended to collect all rainwater in the area and channel it through the city and into the Arkansas River without causing damage. Joe Creek, an active regularly flowing stream, was designated as a major artery for the operation of the flood control system.

The contract required plaintiff to perform channel and drainage excavation. Fill and backfill were also required, as well as placement of riprap on the bottom and slope of the channel for 2,000 feet at the lower end of the project and placement of concrete channel lining, with subdrainage system, for approximately 8,900 feet at the upper end of the project. These improvements were intended to provide a straightened, widened channel, with riprap or concrete surface that, by providing decreased resistance to water flows, would permit increased velocity of water flow which, in turn, would increase channel capacity without overflowing its banks. The completed project span was designed to be capable of carrying, without overflow, up to and including the 100-year frequency flood.[1] The contract also required the construction of a concrete transition section in order to lower the elevation of the channel. This section would follow the natural creek bed as effected by erosion.

---

**1.** The statistically derived expectancy of such a flood is one that is expected to be equaled or exceeded once in 100 years in that channel.

The contract price was set at $6,489,-249.65 with completion to be within 945 days of receipt of notice to proceed. The project was completed on December 5, 1980, within the contract performance date as extended by 33 days by the contracting officer. The completed project was accepted by defendant and on November 11, 1981 defendant paid plaintiff the amount due and owing except for $100 retainage.

Plaintiff's claims arise out of certain weather related events that occurred during performance of the contract, *i.e.,* heavy rainstorms occurred on June 8 and 20 and July 7, 1979 that caused the normal stream flows to overtop temporary cofferdams built by plaintiff to keep the construction area dry, as required by the terms of the contract. This over-topping caused damage to permanent concrete work and permanent and temporary excavation and fine grade filter material then in place. Less severe storms on May 12, 1979 and May 2 and June 17, 1980 caused similar results although with less damage to concrete and filter material. There were other rainstorms throughout the construction period but did no, or only minor damage to the permanent work, and are not at issue here. Plaintiff and its "Monday morning quarterback" engineers and heavy construction designers claim that the damage occurred because defendant failed to include in the contract detailed specifications and procedures for the protection of the permanent work during the construction phase. Plaintiff also blames the design of the transition section for many of its problems.

Paragraph 12, the Permits and Responsibility Clause of the General Provisions (construction contract), and the Damage to Work Clause, ¶ 8, of the Construction Special Conditions place the risk of loss for all pre-completion damage to permanent work on plaintiff with the exception of damage caused by flood or earthquake. Accordingly, plaintiff was required to replace, at its own expense, all damage to permanent work, except that which fell, in the judgment of the contracting officer, within the defined flood or earthquake exceptions, and provided the damage was not due to plaintiff's negligence or failure to use good engineering and construction procedures. Such damages would be reimbursed by defendant. This contract also defined "flood" in the Control of Water During Construction Section of the Technical Provisions, ¶ 7.4.

Prior to the June 8, 1979 rainstorm, the first storm which resulted in heavier than normal damage, there had been several smaller storms which caused some damage to the project. The parties, in discussing these initial events at the time they occurred, agreed that plaintiff was responsible for those losses pursuant to the contract since the water flows had not reached the defined "flood" level.[2] However, after the first major storm, on June 8, 1978, plaintiff notified defendant that it would make a claim to recover the cost of repair and replacement of the permanent work. Thereafter, plaintiff filed with defendant a claim for each of the subsequent events despite the fact that at no time during the performance period of the contract did the water flows reach the defined "flood" elevation.

After each of the above-mentioned larger losses of concrete, defendant's representatives visited the construction site to observe the losses of concrete. On each occasion plaintiff complained about the defects of the transition section and filter-material design and indicated that it would file a claim under the contract. However, at no time prior to June 8, 1979 did plaintiff attempt to implement sufficient measures to protect the unfinished permanent work from storm damage.

After June 8, in an attempt to assist plaintiff from additional losses, plaintiff contends that defendant directed plaintiff

2. Paragraph 7.1 of the Technical Provisions requires the contractor to design and construct protective works of a sufficient size and design "to prevent damage to the work during construction." If the protective works are inadequate the contractor shall, at its expense, make the necessary corrections.

to work on placing concrete slopes and bottoms at specified locations rather than replacing concrete directly in the transition section, and to excavate and place rock and other materials at various locations in the bottom of the channel, which plaintiff did. However, plaintiff admittedly sought to mitigate damages by implementing its own measures. Without defendant's direction, advice or assistance, plaintiff placed at exposed edges of concrete riprap, steel plate cut-off walls, backfill, and, at the leading edge of the transition section, compacted dirt from the area. Plaintiff, also on its own initiative, placed gabions at exposed upstream edges of concrete and compacted clay at exposed side edges. These measures helped prevent some further losses of concrete but were not completely effective. Plaintiff also retained its own engineering design consultant after the three major events that caused damage to permanent work and large losses of concrete. At the consultant's suggestion, plaintiff requested a change to permit the use of coarse-graded in lieu of the fine-graded filter material as required by the contract. Plaintiff alleges that defendant denied the request but offers no evidence as to what result may have otherwise occurred.

Plaintiff, in each instance, made the necessary repairs and notified defendant of its intention to claim compensation for increased cost of performance. Pursuant to the Contract Disputes Act of 1978, plaintiff requested equitable adjustment from the contracting officer by letters dated December. 2, 1980 (for the larger losses of concrete in the June 8 and 20 and July 17, 1979 events) and February 13, 1981 (for the smaller losses of concrete). On September 28, 1981 the contracting officer rejected plaintiff's claims stated in the February 13, 1981 letter for lack of timely notice, which prevented defendant's ability to investigate. The claims in the December 2, 1980 letter were denied by the contracting officer on the merits.

On August 20, 1982 plaintiff filed suit in this court based on three alternative theories of recovery: Breach of contract based on defective design specifications; refor-

mation of contract due to mutual mistake; and damages based on an unauthorized deviation from the Damage to Work Clause, ¶ 8, of the Construction Special Conditions. Defendant filed a Motion for Summary Judgment challenging the entirety of plaintiff's complaint and plaintiff filed a Cross-Motion for Summary Judgment on the third issue, the alleged unauthorized deviation issue.

Jurisdiction is proper in this court pursuant to the Contract Disputes Act of 1978, 41 U.S.C. 609(a) and this court's general jurisdictional statute, the Tucker Act, 28 U.S.C. 1491.

## DISCUSSION

Defendant seeks summary judgment and an order dismissing plaintiff's Complaint. To grant Defendant's Motion for Summary Judgment there must be no genuine issue of any material fact. *South Louisiana Grain Service, Inc. v. United States*, 1 Cl.Ct. 281, 289 (1982); *Technograph Printed Circuits, Ltd. v. United States*, 178 Ct.Cl. 543, 560, 372 F.2d 969, 980 (1967). The court will first examine the operative sections of the contract and their effect before individually addressing plaintiff's three theories of recovery.

▮▮▮ The principal question before the court is which party must bear the responsibility for damage to permanent construction prior to completion of the contract. Defendant contends that the language of the contract is clear and places responsibility on the contractor. (See footnote 2, *supra*.) Plaintiff challenges this traditional approach to the resolution of government contract disputes by asking the court to give recognition and credence to at least one of its three theories of recovery. The court finds, however, that there is a greater wisdom behind the traditional interpretation given government contract disputes in the federal common law when it finds the contract provisions to be as clear as those in this case.

The court finds in the first instance that the contract language governing these is-

sues is unambiguous, in that it simply and without doubt places all responsibility for pre-completion work damage on the contractor, with the dual exceptions for flood and earthquake damage. The Permits and Responsibilities Clause[3] of the Construction General Provisions, provides that the contractor shall be responsible for all materials delivered and work performed until completion and acceptance of the entire construction work. The two exceptions to this contractor responsibility provision are found within the Construction Special Provisions in the Damage to Work Clause.[4] The Damage to Work Clause, which incorporates by reference the Permits and Responsibilities Clause, and is repeated verbatim in the Engineer Contract Instructions (ECI) 7–671.3, unquestionably states that plaintiff must repair damage to permanent work prior to acceptance by the defendant at its expense. However, defendant will reimburse plaintiff its costs incurred in making the repairs at a later date if the defendant's contracting officer finds that plaintiff was not negligent and that it used good engineering and construction principles. Taken together, the two clauses place all pre-completion damage responsibility on the contractor, with the only exception giving discretion to the contracting officer to compensate for flood and earthquake damages.

Since there are no allegations of earthquake damage, the questions that remain are: What qualifies as flood damage and do the conditions set forth in this complaint qualify as such. The Damage to Work Clause (ECI 7–671.3), contains no definition for the word "flood." The contract, however, at paragraph 7.4 of the Technical Provisions included a definition for flood in order to avoid undesireable contingencies in bidding by establishing a standard for damage responsibility which would be reasonable and workable.

The definition of flood is precisely defined in ¶ 7.4 of the Technical Provisions of the contract. Unless there is a flow in the channel of at least 630.5 feet above mean sea level between station 114+44 and the downstream limit of 651.8 feet above mean sea level between station 114+44 and the upstream limit of the work, by definition, there is no flood. Since there was no flow in the channel of 630.5 feet or more, during the contract performance period, and plaintiff has not alleged that any of the flows causing the damage exceeded 630.5 feet, plaintiff is responsible for all the damage to the work in accordance with the above-cited specifications.

Plaintiff admits that the water damage incidents in question do not meet the required standard defined in the contract in order to place the responsibility on the government. However, plaintiff contends that neither party expected such damage and that the flood defining provision should have been set at a lower level where plaintiff would only be responsible when minimal damage occurred. In the alternative, plaintiff contends that the flood provision, as defined in the contract, should be stricken from the contract because it improperly deviates from the procurement regulations

3. 12. PERMITS AND RESPONSIBILITIES (1964 JUN):

... (Contractor) shall also be responsible for all materials delivered and work performed until completion and acceptance of the entire construction work, except for any completed unit of construction thereof which theretofore may have been accepted.

4. *Construction Special Provisions:*

8. DAMAGE TO WORK (1966 MAR OCE). The responsibility for damage to any part of the permanent work shall be as set forth in the clause of the contract entitled "Permits and Responsibilities." However, if, in the judgment of the contracting officer, any part of the permanent work performed by the con-

tractor is damaged by flood or earthquake, which damage is not due to the failure of the contractor to take reasonable precautions or to exercise sound engineering and construction practices in the conduct of the work, the contractor will make the repairs as ordered by the contracting officer and full compensation for such repairs will be made at the applicable contract unit.... Except as herein provided, damage to all work (including temporary construction), utilities, materials, equipment, and plant shall be repaired to the satisfaction of the contracting officer at the contractor's expense, regardless of the cause of such damage. (ECI 7–671.3)

then in force, the Armed Services Procurement Regulation (ASPR) 1–109 and the ECI 1–109.

It is evident to the court that neither party expected the nature of damages for water below the flood definition level. However, it is an irrefutable fact that plaintiff was aware of the definition of flood in the contract. This is evidenced by plaintiff's admission that it adjusted the price of its bid from the price it had derived from the initial bid, which did not contain a flood defining clause. Plaintiff's acknowledgement of the flood definition, as evidenced by its bid adjustment, leaves the court no choice but to interpret and implement the contract as it was clearly written. It is well settled that where one agrees to do, for a fixed sum, a thing possible to be performed, he will not be excused or become entitled to additional compensation, because unforeseen difficulties are encountered. *United States v. Spearin*, 248 U.S. 132, 136, 39 S.Ct. 59, 61, 63 L.Ed. 166 (1918); *Day v. United States*, 245 U.S. 159, 38 S.Ct. 57, 62 L.Ed. 219 (1917).

There is no need for the court to consider parol evidence as to plaintiff's intentions or interpretations concerning a contractual clause when it is clear and lucid. Moreover, the court's position on the parol evidence rule is well stated in *Baggett Transportation Co. v. United States*, 162 Ct.Cl. 570, 577–78, 319 F.2d 864, 868 (1963):

> The rule forbids to add by parol when the writing is silent, as well as to vary where it speaks * * * *Thompson v. Libbey*, 34 Minn. 374, 26 N.W. 1 (1885). It is difficult to see how Quotation No. 52 could have spelled out more lucidly the conditions under which the alternative rates of $1.60 and $1.38 were applicable. There is no ambiguity here. Consequently, parol evidence will not be considered. *Mason v. United States*, 144 Ct.Cl. 579, 169 F.Supp. 507 (1959); *Western Mach.*

*Co. v. Northwestern Implement Co.*, 254 F.2d 453, 458 (9th Cir.1957).

The court, in the present case finds the flood reimbursement provision and definition perfectly clear and finds no reason such as mistake or fraud, to consider any parol evidence on this point. The court will now address plaintiff's three alternative positions.

I

Plaintiff seeks equitable adjustment to the contract price because of alleged defective design specifications and breach of an implied warranty of design. Plaintiff claims that the filter material and the design of the transition section was defective and that the failure of the specifications to contain either detailed instructions and procedures for protecting the unfinished permanent work [5] or a warning of expected losses constituted a design defect. Plaintiff's contentions are without merit.

Plaintiff contends that it is entitled to recover losses caused by defective specifications for placement of the concrete. Without explaining how, plaintiff claims that this resulted in damage to the concrete "(i) by requiring the transition section design and fine-graded filter material and (ii) by omitting known safeguards, (cut-off walls and measures at exposed edges of concrete between placements) which made the aforesaid transition section and filter material made necessary." Plaintiff states that these specifications were detailed design specifications with only a limited number of available procedures. It is from this premise that plaintiff asks for relief from the application of the government's implied warranty of its design specifications, as set out in *J.D. Hedin Construction Co. v. United States*, 171 Ct.Cl. 70, 76, 347 F.2d 235 (1965).

It is well settled that where the government orders a structure to be

---

5. "Permanent work," as defined by Mr. Weldon M. Gamel, Civil Engineer for U.S. Army Corp of Engineers was: "work performed by the contractor which would become a part of the completed project, as opposed to that of a temporary nature which would not become a part of the completed project." This interpretation was cited positively by plaintiff and is accepted by the court.

built, and in .so doing prepares the project's specifications prescribing the character, dimension, and location of the construction work, the government implicitly warrants, nothing else appearing, that if the specifications are complied with, satisfactory performance will result. *E.g., United States v. Spearin,* 248 U.S. 132 [39 S.Ct. 59, 63 L.Ed. 166] (1918); *Laburnum Construction Corp. v. United States,* 163 Ct.Cl. 339, 325 F.2d 451 (1963); *Arcole Midwest Corp. v. United States,* 125 Ct.Cl. 818 [113 F.Supp. 278] (1953); *Stapleton Construction Co. v. United States,* 92 Ct.Cl. 551 (1940).

Both parties cite *J.L. Simmons Co. v. United States,* 188 Ct.Cl. 684, 689, 412 F.2d 1360, 1362 (1969) as a proper standard for defining design specifications. That court stated:

> The specifications, which were prepared by the defendant, are a classic example of "design" specifications, and not "performance" specifications. In other words, in these specifications, the defendant set forth in precise detail the materials to be employed and the manner in which the work was to be performed, and plaintiff was not privileged to deviate therefrom, but was required to follow them as one would a road map. In contrast, typical "performance" type specifications set forth an objective or standard to be achieved, and the successful bidder is expected to exercise his ingenuity in achieving that objective or standard of performance, selecting the means and assuming a corresponding responsibility for that selection.

▆▆▆ Plaintiff argues that the contract contained only design specifications and that the strict observance of the government's design specifications triggers the government's implicit warranty that satisfactory performance will result if the specifications are followed to the letter. *United States v. Spearin,* 248 U.S. 132, 137, 39 S.Ct. 59, 61, 63 L.Ed. 166 (1918). Applying *Ordnance Research v. United States,* 221 Ct.Cl. 641, 609 F.2d 462 (1979) and *R.E.*

*D.M. Corp. v. United States,* 192 Ct.Cl. 891, 428 F.2d 1304 (1970). Plaintiff, however, asks this court to go one step further and to apply this implicit warranty to pre-completion difficulties.

Defendant in its Motion for Summary Judgment cites cases which stand for the proposition that the government is under no obligation to design its construction projects so that they are impervious to all events of nature prior to completion. *L. & A. Contracting Company,* ENG BCA No. 2690, 66–2 BCA ¶ 5730 at 26,717–26,718 held that:

> .... we cannot find on record in this case that compliance with the plans and specifications would produce anything other than satisfactory results. The evidence is that the completed drainage ditch is satisfactorily performing the function for which it was designed ...
>
> ... It is true that the design did not prevent damage while the ditch was in an uncompleted state. But the government was under no obligation that it do so. The contract very clearly places upon appellant responsibility to protect uncompleted work. The risk of loss, unless caused by Government fault or placed upon the government by some special provision of the contract, follow the responsibility to protect....

Defendant in its reply brief agrees in part with plaintiff on the application of *Ordnance Research v. United States,* 221 Ct.Cl. 641, 609 F.2d 462 (1979) and *R.E. D.M. Corporation v. United States,* 192 Ct.Cl. 891, 428 F.2d 1304 (1970), in that if such specifications prove defective the government must compensate the contractor for the additional cost of performance. Also, as defendant points out, plaintiffs recovered in *Ordnance Research* and *R.E. D.M. Corporation* for pre-completion losses because the specifications were deemed to be defective. Taken collectively, these cases stand for the proposition that in a design specification contract, absent any contract provisions to the contrary, the government implicitly warrants that satisfactory performance will result. This is

not a warranty against pre-completion losses unless they are caused by compliance with government's defective design specifications.

However, defendant contends that the present case differs from *Ordnance Research* in that the government did not specify the way to build and protect the channel improvements during construction, and, more importantly, differs from *R.E.D.M. Corporation* because in the present case an acceptable structure could have been and was produced. To award pre-completion damages, the court must make two determinations: (1) Were the specifications so specific so as not to allow plaintiff any discretion in constructing the project and specifically the transition section; and (2) if so, were the specifications defective.

The court agrees with defendant that it did not specify the way to build or protect the channel improvements. Plaintiff, in its opposition, even admits there were three or four available construction procedures, *e.g.*, all of which were standard and fully acceptable. While the court is aware of the responsibilities of the government for pre-completion damage when it provides defective design specifications, absent such findings, defendant's obligation to plaintiff is to provide specifications, which, if followed, will result in a functioning project which can be built. *Jefferson Construction Co. v. United States*, 183 Ct.Cl. 720, 727, 392 F.2d 1006, 1011, *cert. denied*, 393 U.S. 842, 89 S.Ct. 122, 21 L.Ed.2d 113 (1968). Defendant was not required to design this project or provide protective measures so the project could be built under all situations, including heavy rainstorms. Plaintiff in turn was required to possess sufficient knowledge of engineering, including hydrological expertise and construction skills to protect unfinished work from the effects of inclement weather. Plaintiff knew, as well as defendant, that there was a distinct possibility of heavy rains at certain times of the year in Tulsa and that pre-completion damage to the project could necessarily follow. It was for this reason that the government required plaintiff to plan its dikes, cofferdams, etc. to fail before the water rose too high and created an even worse flood. The contract, Technical Provisions paragraph 7.3, for example, required the dikes and cofferdams to fail when overtopped.[6]

The court is convinced that this contract was a "performance" contract. Admittedly, there were instances where the Corps' performance specifications could be interpreted as design specifications but, upon careful analysis, it becomes readily apparent that the contract as a whole failed to pass the "design" specification test. Like *Penguin Industries, Inc. v. United States*, 209 Ct.Cl. 121, 530 F.2d 934 (1976), defendant drafted and used performance specifications and what might be considered by some as design specifications in the same contract. This does not make the contract a "design" contract because even the so-called design specifications contained performance-type requirements.[7] It must be borne in mind that design specifications are

---

6. *7.3 Dikes and Cofferdams.* Design and location of dikes and cofferdams shall be the responsibility of the contractor except for the following limitations. Dikes or cofferdams shall be the responsibility of the contractor except for the following limitations. Dikes or cofferdams shall not back water at any point to more than one-half the depth of the channel at any time during construction and shall be designed and constructed to fail when overtopped.

7. The court has difficulty in believing that every government contract entered into can so neatly be placed in such black and white terms as design specification or performance contract. The court does not necessarily find that these terms have to be so mutually exclusive. Certainly one can find numerous government contracts exhibiting both performance and design specifications characteristics. One such case that notes such a possibility is *J.B. Williams Co. v. United States*, 196 Cl.Ct. 491, 509, 450 F.2d 1379, 1389 (1971).

It is stated as follows:
Coupled with the Board's finding that the specification was 'both a performance and design specification, primarily the former...'
The court finds that such a possibility is present in the case at bar, as both design specifications and performance characteristics are evident in the contract.

explicit, unquestionable specifications which tell the contractor exactly how the contract is to be performed and no deviation therefrom is permissible. This contract was replete with examples such as DIVISION 3, SECTION 3A–CONCRETE, which stated, in detail, how the concrete was to be mixed, its contents, proportioning, production, etc. Yet, at almost every step, the contractor was to use its own judgment and experience in deciding how, when, where, under what conditions, and which proportion would be best for which project section. Plaintiff had a duty as set forth in great detail in the contract to exercise its own judgment and experience. The contract is more like a performance contract than a design contract, because plaintiff had the "... responsibility for the means and methods selected to achieve the end result." *J.L. Simmons Co. v. United States*, 188 Ct.Cl. 684, 412 F.2d 1360 (1969). For these reasons the court agrees with defendant that the specifications provided in the present case do not implicitly warrant pre-completion construction or successful end product.

■ Plaintiff seeks equitable adjustment to the contract price because of differing site conditions. Plaintiff contends that the design of the transition section caused extreme and unnatural damage due to high water velocity and turbulence, which constituted a differing site condition. To support this contention, plaintiff imprecisely cites *Roen Salvage Co.*, ENG BCA 3670, 79–2 BCA 91 13,882. The Board does state, as plaintiff attempted to cite, that:

> Thus, though bad weather, in itself, is not a differing site condition ... weather may bring out latent adverse characteristics of an ostensibly normal site condition. This is compensable under the clause.

(Citations omitted.)

This decision is particularly helpful, but not because of the section plaintiff cites. In the very next paragraph, the Board states, in pertinent part:

> On the other hand, drifting snow which blocked the access road to the site was not a changed condition.... And inundation by surface flooding following heavy rains is one of the hazards of the undertaking a contractor assumes when he enters into a contract.

(Citations omitted.)

The Board decision also stated that unusually high and turbulent waters which impeded performance of the dredging contract and resulted in frequent breakdowns was not a changed condition citing *Standard Dredging Corporation*, ENG BCA No. 2657, 69–1 BCA ¶ 7379. The court finds this conclusion to be most insightful to the present case.

The Court of Claims decisions reveal that rain weather conditions do not constitute a valid basis for a differing site condition claim. In *Arundel Corporation v. United States*, 103 Ct.Cl. 688, 711–12 (1945), plaintiff, a dredging contractor, sued for damages it allegedly suffered because a hurricane reduced the amount of material to be dredged. The court held:

> .... It is a general principle of law that neither party to a contract is responsible to the other for damages through a loss occasioned as a result of an act of God, unless such an obligation is expressly assumed. Here, the contract was silent in that regard and whatever loss plaintiff may have sustained must be borne by it, and not by the Government.

Further, the Court of Claims stated in *Turnkey Enterprises v. United States*, 220 Ct.Cl. 179, 187, 597 F.2d 750, 754 (1979):

> The flow of the river and rainfall are so intertwined as to make it impossible to separate the river conditions from the weather. The record demonstrates clearly that weather was the dominant factor which actually determined the nature of river conditions during the period in issue. Weather, as indicated previously, is not a risk which is shifted to defendant via the changed conditions clause. *Hardeman-Monier-Hutcherson v. United States*, 198 Ct.Cl. 472, 485–86, 458 F.2d 1364, 1370–71 (1972).

■ Plaintiff's final contention under claim one is that defendant's non-disclosure of its "constructive superior knowledge" of the differing site conditions and possible preventive measures is a breach of contract. In other words, plaintiff claims that defendant's respected experience and expertise in the engineering field and in the construction of similar projects gave it superior knowledge to that of plaintiff which, plaintiff, claims, should have been imparted to plaintiff via the design specifications. Plaintiff uses the phrase "constructive superior knowledge," but does not bother to define it for the court. If the court had to guess it would say that constructive superior knowledge is superior knowledge that is not known to defendant, but should be, and according to *Shea, infra,* must be disclosed to plaintiff. We assume that plaintiff intended "constructive superior knowledge" to mean the same as superior knowledge, and will act accordingly. "Superior knowledge" is defined as knowledge which is vital to performance of the contract but which is unknown and is not reasonably available to bidders who are thereby misled. The government must disclose such superior knowledge or be held liable for breach. *J.F. Shea Co., Inc. v. United States,* 4 Cl.Ct. 46 (1983). In this case it is clear that any "knowledge" of the principles involved here, *i.e.,* hydrology and weather, is not unique to defendant. Plaintiff has access to the same principles and knowledge available to the defendant. In fact, counsel for plaintiff informed the court that plaintiff even has employees with this knowledge. If plaintiff failed to consult a hydrologist or review past area weather information, as the situation appears to be to the court, such failure is indefensible. Plaintiff's charge of "secretiveness" against defendant by failing to "instruct" plaintiff is a specious charge. Plaintiff is without excuse and cannot prevail on this count.

## II

Plaintiff claims that it should be awarded the costs of damages under the flood damage reimbursement provisions based on several theories of recovery: Reformation for mutual mistake; interpretation of the flood provision and contractor's mistake in bid.

■ Plaintiff contends that the flood-defining provision is not an accurate reflection of what the Corps intended to accomplish as it does not adequately allocate the responsibility for damages between the two parties. Plaintiff admitted that at the time the contract was entered into it regarded the provision as an authoritative derivation of a fair and equitable demarcation point, representing the point at which responsibility for damages passes from the contractor to the government. Plaintiff contends that it was their understanding that there would be no damage caused by water levels below this definition. Plaintiff now argues that there was a mutual mistake with the derivation of this figure because there was damage caused by water levels below this level. The court finds that plaintiff is unable to substantiate that any mistake was made in the formulation, interpretation and understanding of the provision. The provision was established to provide a standard by which the contracting officer could determine whose responsibility any flood damaging events might be.

In a case similar to the present one, *Fraass Surgical Manufacturing Co., Inc. v. United States,* 215 Ct.Cl. 820, 825, 571 F.2d at 34, 37 (1978), plaintiff unsuccessfully sought, through reformation, to rectify the alleged mistaken inclusion of a clause. The clause in question allotted to the contractor risk of loss by fire of government-furnished materials. Plaintiff maintained that the government intended to include a different clause. The court stated it normally grants reformation when there has been a mutual mistake of fact, which causes the terms of the written contract to depart from the actual intention of the parties. *Fraass Surgical Mfg. Co. v. United States,* 215 Ct.Cl. at 825, 571 F.2d at 37 (1974); *Space Corp. v. United States,* 200 Ct.Cl. 1, 8–9, 470 F.2d 536, 540 (1972); *Bromion, Inc. v. United States,* 188 Ct.Cl. 31,

35, 411 F.2d 1020, 1022 (1969). However, the plaintiff in such a case must show that the government would have agreed to the contract if worded in accordance with the plaintiff's intention. It is clear in the present case that defendant did not. *Ling-Temco-Vought, Inc. v. United States,* 201 Ct.Cl. 135, 150–51, 475 F.2d 630, 639 (1973); *McNamara Construction of Manitoba Ltd. v. United States,* 206 Ct.Cl. 1, 9–10, 509 F.2d 1166, 1170 (1975). Another justification for reformation is for the plaintiff to show that the mistake was one of which the government either knew or should have known. *Burnett Electronics Lab., Inc. v. United States,* 202 Ct.Cl. 463, 472, 479 F.2d 1329, 1333 (1973); *Ruggiero v. United States,* 190 Ct.Cl. 327, 339–40, 420 F.2d 709, 715–16 (1970). Plaintiff, in alleging that there was a mistake has not satisfied the court that any mistake was made in light of the clearness of the agreement. Even if plaintiff was able to satisfy the court that there was a mistake, which it has not, the plaintiff still has not proven to the court's satisfaction, as required by the above-cited case law, that the government would have entered the contract if worded in accordance with plaintiff's alleged intention or that the government did know or should have known of any mistake. Indeed, plaintiff has failed to show the very existence of a mistake in the contract.

Plaintiff also asks the court to re-interpret ¶ 7.4 of the Technical Provisions, the flood definition term, to its benefit. This court has stated previously, when a written term of a contract is unambiguous on its face, and is subject to no more than one interpretation, no legitimate purpose exists for introducing strained evidence of prior negotiations or understandings. *Sylvania Electric v. United States,* 198 Ct.Cl. 106 at 126–28, 458 F.2d 994 at 1005–06 (1972). Since the flood definition clause is clear and unambiguous, there is no need for interpretation by the court.

Plaintiff's last major theory of recovery in this count is for reformation based on plaintiff's unilateral mistake, coupled with the defendant's inadvertent mis-

representation. The court need not consider this issue as there was no showing of any misrepresentation on the part of the government intentionally or unintentionally by the plaintiff. "The equitable remedy of reformation to correct a unilateral mistake in a plaintiff's bid is available only 'if the government knew or should have known of a mistake in a bid costly to the bidder.' " *Carrier Corporation v. United States,* 6 Cl.Ct. 169, 173 (1984) citing *Burnett Electronics Laboratory, Inc.,* 202 Ct.Cl. 463, 472, 479 F.2d 1329, 1333 (1973). Furthermore, plaintiff's understanding of the ramifications of the flood-defining provision is shown by its adjustment in its bid price of approximately $60,000.00 when the provision was placed in the second Invitation to Bid. The balance of plaintiff's theories in Count II, *e.g.,* contractor's unilateral mistake coupled with defendant's misrepresentation and equitable adjustments for compensation for constructive changes are unsupported. Such a superficial representation of theories does not merit this court's attention.

### III

Plaintiff also contends that the intention of Technical Provision ¶ 7.4, the flood definition to ECI 7–671.3 is an unauthorized deviation. Plaintiff apparently believes that if the waters had reached a level greater than the level stated in the definition, the government would have urged the court to expunge the provision to prevent recovery. Plaintiff states that the court would then have to award the contractor reimbursement in quantum meruit. While it is not in the tradition of this court to deliberate over such a hypothetical situation it can nevertheless be said that this conclusion, as drawn by counsel for plaintiff, is unfounded as well as unprofessional, moreover, it is of no consequence as the court finds that the agreed-upon insertion of a definition for the word "flood" in ECI 7–671.3 is not a deviation that requires approval in accordance with then ASPR 1–109. It is axiomatic that a collateral provision, such as Technical Provision ¶ 7.4,

is considered by this court to deviate from another related clause when it modifies either the other clause or its prescribed application. In the present case the insertion of a definition clause does not modify clause ECI 7–671.3 or its application.[8] It merely defines a word that was previously undefined. By defining the word "flood" in the second Invitation for Bids and later the contract, defendant then had an objective standard, accepted by the contractor, by which an objective determination may be made of a generally subjective matter. Therefore, the court finds this definition an agreement between the parties to define a word which had previously been undefined by the ECI provisions and the contract, and is not an unauthorized deviation from ECI 7–671.3. The court finds for the defendant on count III.

## CONCLUSION

The court accordingly grants Defendant's Motion for Summary Judgment and denies Plaintiff's Motion for Partial Summary Judgment on Count III of its Complaint and the clerk of the court is ordered to dismiss the Complaint.

IT IS SO ORDERED.

---

**8.** Since the court finds that the definition is not a deviation, there is no need to discuss the validity of plaintiff's application of the "Christian Doctrine", *G.L. Christian and Associates v. United States,* 160 Ct.Cl. 58, 312 F.2d 418, *reh'g denied* 160 Ct.Cl. 58, 320 F.2d 345, *cert. denied* 375 U.S. 954, 84 S.Ct. 444, 11 L.Ed.2d 314 (1963), thereby eliminating the need to determine the validity of plaintiff's alternative argument, application of ASPR 1–109, to the present case.