**AIRCRAFT GEAR CORP., Plaintiff,**

v.

**KAMAN AEROSPACE
CORP., Defendant.**

No. 93 C 1220.

United States District Court,
N.D. Illinois,
Eastern Division.

June 13, 1994.

Richard Reichstein, for plaintiff.

Aaron Hoffman, for defendant.

### MEMORANDUM OPINION AND ORDER

SHADUR, Senior District Judge.

Aircraft Gear Corporation ("Aircraft") has brought suit against Kaman Aerospace Corporation ("Kaman"), seeking damages for the alleged breach of a subcontract under which Aircraft supplied certain steel gears for helicopters that Kaman manufactured for the United States Navy. Although the work was completed and the over $3 million contract price was paid, Aircraft asserts it is now entitled to an additional $1.831 million to cover expenses that it incurred when the task turned out to be more difficult and expensive than expected. Aircraft argues that Kaman should be liable for those costs because Kaman assertedly failed to live up to its contractual obligation to provide workable detailed specifications instructing subcontractor Aircraft in how to tackle the job.

Kaman has responded with a motion for summary judgment. Because Aircraft's rejoinder to Kaman's legal position raises no material issues of fact and because Kaman's position is sound, Kaman's motion is granted.

### Summary Judgment Principles

Familiar Rule 56(c) principles teach that to be "entitled to a judgment as a matter of law," the moving party must establish the absence of any "genuine issue as to any material fact" (*Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986)). In that respect a "genuine issue" requires that there be sufficient evidence for a jury to return a verdict in

favor of the nonmoving party (*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986)), while a "material fact" is one that "might affect the outcome of the suit under the governing law" (*id.* at 248, 106 S.Ct. at 2510; *Pritchard v. Rainfair, Inc.*, 945 F.2d 185, 191 (7th Cir.1991)). Applying those principles, this Court is not required to draw "every conceivable inference from the record—only those inferences that are reasonable" in favor of nonmovant Aircraft (*Bank Leumi Le–Israel, B.M. v. Lee*, 928 F.2d 232, 236 (7th Cir.1991)).

To implement Rule 56—most particularly to smoke out the existence or nonexistence of material factual disputes—this District Court has adopted General Rule ("GR") 12(m) and 12(n). GR 12(m) requires every Rule 56 movant to submit a statement of allegedly uncontested facts accompanied by supporting citations to the record in support of each fact alleged, while GR 12(n) requires the nonmoving party to respond point by point, with citations to the record in support of (1) any claimed dispute as to the movant's version of the facts and (2) any additional facts that the nonmovant chooses to assert.

■ In this instance Kaman meticulously conformed its initial submission to GR 12(m) as well as to the requirements of Rule 56 itself. Unfortunately Aircraft's counsel demonstrated that whatever might be said about his client's ability to follow specifications, he could not: No GR 12(n) statement of any kind was tendered in response. Instead

counsel's memorandum of law purported to contest some of Kaman's evidentiary submissions,[1] relying in part on some 30 attached exhibits that violated the fundamental dictates of Rule 56(c) and (e) as to the required evidentiary nature of summary judgment materials.[2]

■ Kaman's R.Mem. 2–3 properly took Aircraft to task for that deficiency, citing to a few of the numerous cases in which our Court of Appeals and judges in this District Court have enforced GR 12(m) and (n) literally and strictly by treating the noncomplying Rule 56 respondent as having admitted *everything* in the movant's GR 12(m) statement.[3] This Court granted Aircraft a reprieve, however, by permitting its belated filing of a GR 12(n) response. Yet that filing too has failed to conform to the plain dictates of Rule 56 and GR 12(n):

1. None of the earlier-tendered exhibits was put into a posture in which it is admissible into evidence (see Rule 56(e)). This Court is thus entitled to ignore those exhibits entirely in resolving Kaman's motion—though as later explained, they would not help Aircraft's effort to avert summary judgment even if they were to be considered.

2. Even within the GR 12(n) statement, its counsel reflects the erroneous notion that it is a pleading akin to an answer, so that he mistakenly believes that a material factual issue may be posed by simply stating "deny" in a number of instances (see,

---

1. *P.Mem. 2 impermissibly reflected counsel's total lack of understanding of the clear language and purpose of GR 12(m) and (n)—instead of complying with the latter, he employed this attempted hedge:*

 Except as specifically admitted herein, Aircraft Gear Corporation denies each and every one of Kaman's statement of material facts not in dispute which accompanied its motion to dismiss.

 Such totally unsupported denials have no legal effect whatever, so that Aircraft is deemed to have *admitted* Kaman's statements under the plain mandate of GR 12(n) (see n. 3).

2. There were just four exceptions: P.Exs. 4, 25 and 27 consisted of deposition excerpts, while P.Ex. 26 was a brief affidavit by Aircraft's Supervisor of Engineering David Reis ("Reis"). Even there Aircraft fell far short of its obligations,

because as explained later the Reis affidavit and its bulky supporting materials proved worthless on the current motion.

3. *Most recently Waldridge v. American Hoechst Corp.*, 24 F.3d 918, 920–924 (7th Cir.1994) has walked the same path, upholding the stringent application of the comparable local rule in effect in the Southern District of Indiana. Where such rules are so crystal-clear and where the discretion of the district court to apply such rules strictly has been upheld so consistently (*id.*, 24 F.3d at 922–923), no lawyer (or no lawyer's client) can complain of the effect of noncompliance. And that follows a fortiori where, as here, this Court gave Aircraft and its counsel the opportunity to cure their delinquency and where the ensuing work product continued to be wholly inadequate to comply with Rule 56 and GR 12(n).

e.g., Aircraft's GR 12(n) ¶ 4) or "Deny having information sufficient to form a belief as to the truth of the averment contained in statement 6" (its GR 12(n) ¶ 6).

In the text that follows, this Court will cite to Kaman's GR 12(m) statement—uncontroverted as it is—as "D. 12(m) ¶—." In the few instances in which any reference to Aircraft's response is called for, it will be cited as "P. 12(n) ¶—."

### Facts

Kaman sought and ultimately obtained a contract to build SH–2F Seasprite helicopters for the United States Navy. Under Navy requirements certain gearboxes for those aircraft must be fashioned from steel capable of withstanding elevated temperatures without sustaining either excessive wear or a loss of strength. For that purpose Kaman decided upon an alloy known in the industry as Pyrowear 53 ("Pyrowear"). Fabrication of Pyrowear requires the heat treating process of "carburization," under which carbon is diffused into steel in an extraordinarily hot and carefully calibrated furnace of either an atmospheric or vacuum variety.

Because Kaman has never had the capacity to perform, much less having actually performed, a carburization operation (D. 12(m) Ex. G, Kaman Senior Material and Process Engineer David Saulnier ("Saulnier") Aff. ¶ 5), it consulted with Aircraft and recognized that it had to subcontract the gearbox work.[4] Aircraft's Board Vice Chairman Ken Spurgeon ("Spurgeon") then conferred with Bell Helicopter ("Bell") employee Ed Roseler ("Roseler," a long-time friend) and received manufacturing and metallurgical "advice . . . of very great importance" about the process (D. 12(m) Ex. B (Spurgeon Dept. 91, concluding his extensive testimony on the subject, *id.* 75–91); D. 12(m) Exs. C and D).[5] At Spurgeon's request, Roseler then had a number of discussions with Aircraft's technical personnel and provided them with Bell's documentation on the subject, all to assist them in their own study and work (*id.* 85–91). Aircraft then heat-treated several "experimental gears" to determine whether it could carburize them successfully (P. 12(n) ¶ 10, citing former Aircraft employee Leonard Skronski ("Skronski") Dep. 23, 28).[6]

In October 1986 Kaman and Aircraft reached agreement as to their contractor-subcontractor relationship, and Kaman's Purchase Orders were written up on December 15 for four Input Accessory Gearbox kits and on January 7, 1987 for six Nose Gearbox kits, plus spare parts for both. Each of those Purchase Orders incorporated Kaman's Purchase Order Conditions (revised to March 1985) ("Conditions") and a Statement of Work ("Statement") that set out each party's obligations and listed several specifications (discussed in more detail below) as to the work to be performed.[7] Among Aircraft's delineated duties was its commitment to supply for every component part a manufacturing order (which the parties term an "MO") describing and sketching the entire sequence

---

4. This is not to say that Kaman's people are ignorant in this area of engineering knowledge. As is typical of Aircraft's unfocused attacks on Kaman's motion, its Mem. 2–3 seeks to make much of Saulnier's speaking engagement at a carburizing symposium in July 1989 during which he spoke on "Development of High Temperature Gearing for Helicopter Transmissions." Quite apart from Aircraft's failure to present that material in admissible evidentiary form (so that it is not properly before this Court under Rule 56(c)), it is wholly immaterial to the real issue in this case: Which party was made contractually responsible in 1986 (three years earlier) for the development and delivery of gears that would do the required job?

5. Bell had its own prior experience with Pyroware, having used it for gears in its own helicop-

ters (Spurgeon Dep. 79). Because the technical know how that Bell had acquired was a matter of public knowledge (*id.* 76), Roseler was able to furnish a good deal of information to Spurgeon and the other Aircraft people.

6. P. 12(n) ¶ 10 (deposition citations omitted) summarizes Skronski's testimony by saying that Aircraft's experiment was performed "to determine if material could be adequately cut in the raw and if holes could be drilled in it; to send Kaman one half of the piece as a sample; and to carburize and anneal per Kaman supplied specifications."

7. Four additional purchase orders (dated March 17 and 18, 1988 and February 9 and 10, 1989) were executed calling for a total of 24 more gearboxes.

of operations involved in the manufacturing process. Although Kaman was entitled to review the MOs, they were treated by Aircraft as proprietary and protected from disclosure to competitors. Kaman was authorized under the agreements to issue engineering changes (which the parties term "EOs") to supplement the Purchase Orders.

From Complaint ¶¶ 16–17 it can be gleaned that the gears were ultimately successfully treated and shipped to Kaman, which then paid the $3,004,716 original contract price. This litigation stems from the fact that the Pyrowear manufacturing process turned out to be much more difficult than had initially been anticipated. Development of the proper formulation was therefore a costly endeavor, and resolution of the current controversy essentially boils down to the determination as to which party assumed responsibility for that risk under their agreement.

### Aircraft's Claim

While Aircraft might perhaps have taken some other litigatory tack in organizing the facts of this case, the version of the story that it has chosen to present in its Complaint and in its response to Kaman's motion runs along the lines of an equitable adjustment theory (although it does not expressly characterize it as such). Aircraft essentially contends that when Kaman failed to provide specifications sufficient to fabricate the Pyrowear gears successfully (Complaint ¶¶ 7–8, 10–11, 14–15), Aircraft was required to invest a large measure of additional work and outlays to finish the job (*id.* ¶¶ 14–18).[8] It is

that extra expense ($1,831,375) for which the Complaint seeks recompense.[9]

Aircraft's Mem. 11 appears to shift gears [10] somewhat by asserting that Kaman breached an "implied warranty of specifications" (as to which the seminal decision in the field of government contracts is *United States v. Spearin,* 248 U.S. 132, 136–37, 39 S.Ct. 59, 61, 63 L.Ed. 166 (1918)). That *Spearin* reference really adds nothing to the analysis, for it deals with the different situation in which a contractor follows the dictates of the specifications prepared by someone else and the resulting product or work is defective— then the question is which party must bear the economic consequences of the defects. Here by contrast the end product *did* work, but it cost a great deal more than was anticipated to accomplish that result—so the question is which party must bear the added cost.

But the relevance or nonrelevance of the *Spearin* implied warranty really makes no difference, for both parties correctly treat their disagreement as one that at its core turns on whether the specifications contractually required to be supplied by Kaman to Aircraft were of the "design" or the "performance" variety. If the former—if they were intended as precise road maps vesting little or no discretion in subcontractor Aircraft, so that Aircraft's costly quest to get the job done was something that Kaman should have pursued—Aircraft would have the better of the argument. If on the other hand the responsibility for determining how best to achieve the performance requirements was imposed on Aircraft, Kaman must prevail.

---

**8.** Aircraft's Complaint ¶ 14 alleges in relevant part:

> Plaintiff was authorized and directed by duly authorized representatives of the Defendant, after communicating with officers of the Defendant, to continue with the work and to procure additional materials and to pursue a research and development effort to determine how to carburize PYROWEAR gears; and to otherwise manufacture the gears called for by the Agreements, with the definite understanding that at the completion of the work, and for such *progress payments as would be requested* during the extended course of performance of the work, the Defendant would pay the Plaintiff such additional compensation as was caused by the Defendant's failure to provide

plans and specifications for the work at the time of formation of the Agreements.

**9.** It is striking enough that Aircraft's claim would represent a 60% overrun of its entire $3 million subcontract. But the figures are even more startling than that: Aircraft admits that only $717,-614 of the total purchase price of $3,005,716 was originally contemplated under the contract as the unit price for the Pyrowear gears, so that the present claim would inflate the cost of the gear component of the contract to over 3½ times the contracted-for figure (D. 12(m) Ex. F, Requests For Admission ¶ 16).

**10.** Under the circumstances, this terrible pun was really bound to find its way into this opinion somewhere.

As the ensuing discussion demonstrates, the latter is indeed the case.

## Choice of Law

Each side presents extensive choice of law arguments—Aircraft devotes over a fifth of its memorandum (Mem. 15–19) to the issue, and Kaman then spends nearly half of its reply (R.Mem. 7–14) discussing both Connecticut law and federal law—despite the contract provision that unambiguously specifies Connecticut law as the source of rules of decision which shall govern any resultant disputes.[11] Kaman's Mem. 6–7 contends for the application of federal common law in "matters specific to government contract law." But it cites for that proposition *Peter Kiewit Sons' Co. v. Summit Construction Co.,* 422 F.2d 242, 260 (8th Cir.1969)—which holds exactly the opposite in the current contractor-subcontractor situation (citations omitted):

> The prime contract with Kiewit, being a contract with the Government, is governed by federal law. However, a subcontract between private parties, as is the case here, is governed by state law.
>
> \* \* \* \* \* \*
>
> The rule that contractual disputes between private parties on a subcontract pursuant to a government project are governed by state law has been followed by the Eighth Circuit. The trial court properly applied the law of South Dakota on the damages for breach of contract.

And numerous cases other than *Peter Kiewit* (frequently drawing on *Erie v. Tompkins* principles) also regularly look to state law in resolving disputes between contractors and subcontractors of government contracts (even in the absence of a contractual choice of law provision such as the one here).

■ But Aircraft's success on the choice of law argument is an empty one in substantive terms. Indeed, despite its insistence on the applicability of Connecticut law, Aircraft does not cite a single Connecticut authority[12] and actually relies on numerous federal cases instead. Such reliance is hardly surprising in the area of federal governmental contracting and subcontracting, where federal courts have obviously had far greater opportunities to adjudicate disputes. Although this Court has first looked to Connecticut law, then, it has drawn on federal case law in the many instances where Connecticut law is either nonexistent or sparse or is otherwise inconclusive.

## Nature of the Parties' Contract

As already indicated, Aircraft's only potential for success rests on its ability to prove that Kaman was obligated from the beginning to supply design (as opposed to performance) specifications, so that Kaman would bear the economic price that had to be paid because of its failure to do so in a manner that would produce a useable end product. That determination as to the scope of Kaman's contractual undertaking poses a question of law (*Blake Construction Co. v. United States,* 987 F.2d 743, 746 (Fed.Cir.1993); *Hawaiian Bitumuls & Paving v. United States,* 26 Cl.Ct. 1234, 1239 (1992) (citing *Spearin*)).

*Aleutian Constructors v. United States,* 24 Cl.Ct. 372, 378 (1991) has quoted the "classic formulation" in *J.L. Simmons Co. v. United*

---

11. Condition ¶ 19 states:

 APPLICABLE LAW. All questions concerning the interpretation, construction, performance and enforcement of this order and remedies in the event of default shall be resolved in accordance with the laws of the State of Connecticut.

 Kaman strives to infer some ambiguity from Condition ¶ 14's incorporation of certain Federal Acquisition Regulations. This Court rejects that contention—but if there were any ambiguity, Condition ¶ 19 would prevail on contra proferentem principles (for it appears that Kaman drafted the document).

12. Aircraft does contend that the Connecticut Uniform Commercial Code ("UCC") is "up to the task" of governing this dispute, but it then fails to set forth *any* theory of recovery under the UCC. This Court will not make Aircraft's UCC arguments for it—and in any event Kaman R.Mem. 11–12 is correct in asserting that the parties' contract (one under which Kaman provided the raw materials and Aircraft performed services—carrying out the manufacturing operation) is not within the scope of the UCC anyway (see, e.g., this Court's opinion in *Respect Inc. v. Committee on Status of Women,* 781 F.Supp. 1358, 1363–64 (N.D.Ill.1992) and cases cited there, construing the identical UCC provisions in Illinois law).

*States,* 412 F.2d 1360, 1362 (Ct.Cl.1969) of the distinction between design and performance specifications:

> [D]esign specifications "set forth in precise detail the materials to be employed and the manner in which the work [is] to be performed," from which the contractor is "not privileged to deviate ..., but [is] required to follow ... as one would a road map. In contrast, typical 'performance' type specifications set forth an objective or standard to be achieved ...," requiring the contractor to exercise its ingenuity in achieving the standard of performance, in selecting the means, and in assuming a corresponding responsibility for that selection.

Years earlier the Armed Services Board of Contract Appeals, a body with much experience in the area of government contracting, voiced the very same distinction in *Monitor Plastics Co.,* 72–2 B.C.A. (CCH) ¶ 9626, at 44,971 (1972)—language on which both litigants here seek to rely: [13]

> There are DESIGN specifications which set forth precise measurements, tolerances, materials, in process and finished product tests, quality control, inspection requirements, and other specific information. Under this type specification, the Government is responsible for design and related omissions, errors, and deficiencies in the specifications and drawings. PERFORMANCE specifications set forth operational characteristics desired for the item. In such specifications design, measurements and other specific details are not stated nor considered important so long as the performance requirement is met. Where an item is purchased by a performance specification, the contractor accepts general responsibility for design, engineering, and achievement of the stated performance requirements. The contractor has general discretion and election as to detail but the work is subject to the Government's reserved right of final inspection and approval or rejection.

As is often the case, to a limited extent the relevant specifications here exhibit different qualities in those respects. As *Utility Contractors, Inc. v. United States,* 8 Cl.Ct. 42, 50 n. 7 (1985) has put it:

> The court has difficulty in believing that every government contract entered into can so neatly be placed in such black and white terms as design specification or performance contract. The court does not necessarily find that these terms have to be so mutually exclusive. Certainly one can find numerous government contracts exhibiting both performance and design specifications characteristics.

And where specifications are hybrid in nature, the inquiry turns on whether the contract *as a whole* is "more like a performance than a design contract" *(id.* at 50–51). *Utility Contractors, id.* (footnote omitted) is particularly instructive in that respect:

> The court is convinced that this contract was a "performance" contract. Admittedly, there were instances where the Corps' performance specifications could be interpreted as design specifications but, upon careful analysis, it becomes readily apparent that the contract as a whole failed to pass the "design" specification test. Like *Penguin Industries, Inc. v. United States,* 209 Ct.Cl. 121, 530 F.2d 934 (1976), defendant drafted and used performance specifications and what might be considered by some as design specifications in the same contract. This does not make the contract a "design" contract because even the so-called design specifications contained performance-type requirements. It must be borne in mind that design specifications are explicit, unquestionable specifications which tell the contractor exactly how the contract is to be performed and no deviation therefrom is permissible. This contract was replete with examples such as DIVISION 3, SECTION 3A–CONCRETE, which stated, in detail, how the concrete was to be mixed, its contents, proportioning, production, etc. Yet, at almost every step, the contractor was to use

**13.** Aircraft's attempt to enlist *Monitor Plastics* to its aid is surprising, for that decision really torpe- does Aircraft's legal position.

its own judgment and experience in deciding how, when, where, under what conditions, and which proportion would be best for which project section. Plaintiff had a duty as set forth in great detail in the contract to exercise its own judgment and experience. The contract is more like a performance contract than a design contract, because plaintiff had the "... responsibility for the means and methods selected to achieve the end result." *J.L. Simmons Co. v. United States*, 188 Ct.Cl. 684, 412 F.2d 1360 (1969). For these reasons the court agrees with defendant that the specifications provided in the present case do not implicitly warrant [a] successful end product.

Accord, *Norwood Mfg., Inc. v. United States*, 21 Cl.Ct. 300, 308–09 (1990) (describing contract specifications with both characteristics as "dominantly of the performance type").

That analysis applies with compelling force to the contract here. To begin with, the only express undertaking in the parties' contract to which Aircraft can point is each Statement's ¶ 4.f,[14] which obligates Kaman to "Supply specifications as necessary." Aircraft would have that obviously imprecise language read as though it were a firm commitment on Kaman's part to supply all specifications, both performance and design, in connection with the gears. But that post hoc argument simply is not borne out by all of the evidence that gives content to the terse contractual provision.

■ There can be no better evidence of the scope of Kaman's obligation than the specifications contained in the contract itself. After all, it *is* a breach of contract action that Aircraft has chosen to bring, and it is no more than tautological to state that the parties' contractual undertakings are defined by

their contract. KPS 203,[15] the set of specifications incorporated by Statement ¶ 2.b as "Carburized Parts, Requirements For (*applicable to X–53 Pyrowear* )," sets out a seven-page set of requirements that almost without exception provide a classic example of *performance* specifications. There are perhaps a few that might be thought of as design specifications—or more accurately as combined performance and design specifications. But what is crystal clear is that KPS 203 did *not* provide the kind of detailed "road map" that such cases as *Aleutian Constructors* or *Utility Contractors* or *Monitor Plastics* teach is required to fit the "design specification" definition. Indeed, the conclusion that the original contract between the litigants was overwhelmingly one that involved performance rather than design specifications follows a fortiori from the authorities such as *Utility Contractors* or *Norwood Mfg*.

That conclusion is further bolstered by Statement ¶ 3.d's placement of the duty of generating the actual MOs (manufacturing orders, it will be recalled) on Aircraft and not on Kaman. Plainly this was *not* a situation in which the contractor as buyer delivered the equivalent of blueprints to the subcontractor as seller, so that all that the subcontractor had to do was to manufacture according to those blueprints. On the contrary, the responsibility for producing the blueprint equivalent, that is the responsibility for "exercis[ing] its ingenuity in achieving the standard of performance, in selecting the means, and in assuming a corresponding responsibility for that selection," *Aleutian Constructors*, 24 Cl.Ct. at 378 was unquestionably Aircraft's.

■ Nor does Kaman's retained right to engage in close oversight—in monitoring—shift to Kaman the contract's imposition of design responsibility on Aircraft. That is the

---

**14.** Statement ¶ 1 defined Aircraft's overall undertaking:

 1. *GENERAL*

 The subcontractor shall provide the personnel, materials (*except KSM as defined in para. 4* ) and facilities to accomplish the tasks defined herein for components to the Kaman supplied Drawings, Specifications and Vendor Instruction Sheets.

Statement ¶ 2 listed the Specifications, with this being the relevant one:

 b. KPS 203 Carburized Parts, Requirements for (*applicable to X–53 Pyrowear* )

Statement ¶ 3 spelled out Aircraft's obligations in specific and extensive terms. Statement ¶ 4 identified Kaman's much more limited duties, including the one quoted in this sentence of the text.

**15.** KPS stands for "Kaman Process Specifications."

clear lesson taught by the seminal decision in *J.L. Simmons* and a number of its progeny, where comparable active involvement by the government in monitoring and channeling performance by a contractor did not relieve the latter of the duty to comply with what were predominantly performance specifications.

Thus Aircraft's argument to the contrary, based on the generality of Statement ¶ 4.f, is exposed as nothing more than after-the-fact wishful thinking. Implicitly (though not explicitly) recognizing that, Aircraft essentially shifts gears[16] once again to the approach that Kaman *should* have provided the road map to fulfill its Statement ¶ 4.f promise, but did not. But nothing in the practical construction that the parties gave to their respective responsibilities by their post-contracting conduct (often a reliable clue to what they understood their contract meant in the first place) supports that either.

■ In that respect Aircraft points, for example, to the EOs—engineering orders— that Kaman was authorized to (and did in fact) issue. But the problem there is that Kaman has responded with proof that *none* of its acknowledged EOs "provides, refers to, mentions or makes any change to any procedures for carburizing Pyrowear gears, either as to the general specifications in KPS 203 or as to the detailed carburization procedures used by Aircraft Gear during the manufacture of Pyrowear gears" (D. 23(m) Ex. A, Kaman Mechanical Technology Manager Robert DiRusso Aff. ¶ 10). Aircraft offers nothing but an empty rejoinder: It says (Mem. 4) that Kaman directed Aircraft to make "massive" engineering changes, includ-

ing "changes to the testing, quality assurance and design of the gears and gear housings"— a total irrelevancy, given the uncontroverted evidence that the Kaman orders were not connected to carburizing Pyrowear.

■ In apparent desperation, Aircraft has also sought to overwhelm this Court by tendering two hefty volumes containing what is said to be an analysis of the economic impact of the Kaman engineering changes. Almost all of that impenetrable array of esoteric codes has nothing to do with the Pyrowear gears at all (D 12(m) Ex. G, Saulnier Aff. ¶ 6, stating that only five of the parts in the entire analysis apply to the Pyrowear gears), and *none* has to do with instructing Aircraft on how to carburize Pyrowear (*id.*). Aircraft's only attempts to provide some interpretation or distillation of its massive submissions are a thoroughly unenlightening half-page affidavit from Reis (P.Ex. 26) and an even less informative brief affidavit from Aircraft's consultant Joseph Tokich ("Tokich") (appended to GR 12(n)).[17] Nothing in any of those submissions is shown to be relevant to the issues in this litigation. If Aircraft's counsel believes that summary judgment can be averted simply by burying this Court in several pounds of unexplained figures, he is incorrect.

In its final effort to draw an inference from the parties' post-contract conduct to show that the contractual provision obligated Kaman to provide design specifications, Aircraft points to a series of memoranda (its Exs. 11– 17, 21 and 24)—documents that its Mem. 8–9 describes as a "partial list[18] of evidentiary exhibits all provable [sic] that Kaman speci-

---

16. See n. 10—but twice?

17. Tokich says only that he participated in the analysis of the EOs (Aff. ¶ 4) and that "[o]ne or more of the EO's contain changes to the specifications for core hardness and/or the case depth which directly affected the heat treatment process that was required to achieve those changed specifications" (Aff. ¶ 5). But Kaman correctly points out that core hardness and case depth are properties of the finished gear, so that changes in the specifications for those properties are archetypes of performance specifications—they provide no detailed directives as to *the process* by which Aircraft was to accomplish those results. In sum, Aircraft's effort to swamp this Court with

thick volumes of numerical mumbo jumbo has done nothing more than to create despair among the friends of the environment who seek to save our trees.

18. Aircraft offers no explanation as to why it feels itself entitled to hold back any claimed additional evidentiary weapons it may have at its disposal. On a summary judgment motion (just as at trial) such holding back is impermissible— see, e.g., *Publishers Resource, Inc. v. Walker-Davis Publications, Inc.*, 762 F.2d 557, 561 (7th Cir.1985), quoting this Court's opinion in *Keene Corp. v. International Fidelity Ins. Co.*, 561 F.Supp. 656, 665–66 (N.D.Ill.1982), *aff'd and adopted*, 736 F.2d 388, 393 (7th Cir.1984).

fied, directed, ordered, interposed and controlled the heat treatment processing at Aircraft Gear." That effort is equally unsuccessful.

For starters, the exhibits are not properly before this Court on Kaman's summary judgment motion. As discussed earlier, they do not at all comply with Rule 56(c) and (e). This Court is entitled (as is Kaman) to ignore them entirely.

■ But even if those exhibits were to be considered, they would not lead to the result urged by Aircraft. Kaman is quite correct in saying that most of what is contained in those exhibits is either irrelevant or else points to a conclusion opposite to that advanced by Aircraft. Those documents (like the other exhibits—which are also not qualified as admissible evidence—that Aircraft has offered, such as its Exs. 2, 3, 5 and 10) show nothing more than a close working relationship between the contractor and its subcontractor, under which Kaman sought to assist Aircraft in the latter's performance of *its* obligation to develop Pyrowear. Fairly read, all of the non-evidence proffered by Aircraft simply confirms the conclusion compelled by the original contract documents: It was Aircraft and not Kaman that was assigned the responsibility for devising the Pyrowear recipe, and that hence had to bear its cost. Once again, as *Aleutian Constructors*, 24 Cl.Ct. at 378–79 (citation omitted) has explained in the government-prime contractor context, an explanation that is equally applicable to the relationship here:

> Government contracts not uncommonly contain both design and performance specifications.
>
> * * * * * *
>
> Parts of Aleutian's contract described the materials and methods to be used in construction of the OAMP hangar, and gave some limited detailed drawings of work plaintiff was to perform. However, crucial elements still required Aleutian's ingenuity and expertise to achieve the government's desired performance. Even though a contract may contain some design specifications, when a crucial element of a contract requires the contractor to use its own expertise and ingenuity, a *Spearin* warranty does not arise as to that element of the contract.

It may be worth noting in conclusion that Aircraft's current arguments are also rendered suspect by the time and manner in which they have been presented. After all, Aircraft does not make any showing that it objected at the time that Kaman allegedly "failed" to provide specific instructions regarding the carburization process, or when the parties entered into the four similar additional purchase orders without such specific instructions (see *County Fire Door Corp. v. C.F. Wooding Co.*, 202 Conn. 277, 520 A.2d 1028, 1033 (1987)). Nor has evidence been offered that Aircraft sought to trigger the change order provisions of the Purchase Order Conditions to cover its added cost of design, which could have given rise to adjustments in the purchase price. Though unnecessary to the conclusion already announced here, those things also tend to undercut Aircraft's effort to saddle Kaman with a contractual undertaking long after the fact.

### Conclusion

It is necessary to look long and hard to find any reasonable inferences that may be drawn in Aircraft's favor here. But in any event, such inferences cannot bail out Aircraft's failure to demonstrate the existence of any genuine issue of material fact as to any claimed contractual obligation on Kaman's part to supply anything more than performance specifications. Specifications that are actually incorporated in the parties' contract are predominantly (indeed overwhelmingly) of the performance type, rather than providing the book-type level of directions or drawings that constitute design specifications. Other contract provisions make it equally plain that the responsibility that Aircraft seeks to shift to Kaman is Aircraft's alone, as the consequent cost must be. And the relevant post-contract evidence confirms the meaning of the contract itself. Nothing in the form of either evidence or argument proffered by Aircraft alters these conclusions.

There is no genuine issue of material fact, and Kaman is entitled to a judgment as a

matter of law. This action is dismissed with prejudice.