**ALEUTIAN CONSTRUCTORS, Plaintiff,**

v.

**The UNITED STATES, Defendant.**

No. 22–89C.

United States Claims Court.

Filed Oct. 18, 1991.

Anthony J. Vidlak, Seattle, Wash., for plaintiff.

Letitia J. Hanson, Washington, D.C., with whom was Asst. Atty. Gen. Stuart M. Gerson, for defendant.

## ORDER

TIDWELL, Judge:

This case is before the court on the parties' cross-motions for summary judgment on plaintiff's claim for an equitable adjustment under a government construction contract. For the reasons set forth below, the court grants defendant's motion and denies Aleutian's cross-motion.

## FACTS

This dispute arose out of a contract between plaintiff, Aleutian Constructors, and defendant, acting through the Army Corps of Engineers (Corps), to construct an airplane hangar and dormitory building for the Air Force's Optical Aircraft Measurement Program (OAMP) at Shemya Air Force Base, Alaska. Shemya AFB occupies all of Shemya Island and is situated approximately 1,500 miles west of the Alaskan mainland, near the far western end of the Aleutian Chain. The island is known for its extreme weather conditions, including high winds and humidity. The Corps awarded the contract on February 18, 1983, with a projected completion date of May 15, 1985.

Construction of the $12.8 million project proceeded normally. However, on November 12, 1984, at some time between 9:00 a.m. and 10:45 a.m., high winds partially destroyed a portion the roof of the OAMP hangar before completion of the project, and acceptance by the Corps. Aleutian rebuilt the roof at its own expense. The portion of the roof that was destroyed was the ethyl propylene diene monomer (EPDM) membrane, a watertight, rubberlike plastic sheet stretched over and attached to the barrel-shaped roof deck by round, metal fasteners. The membrane tore loose from the fasteners, and exposed a forty-by-fifty-foot section of the roof system substructure. Queen City Sheet Metal and Roofing of Seattle (Queen City) was the roofing subcontractor that constructed the roof; DiversiTech General, Inc., a subsidiary of General Tire and Rubber Corporation (General Tire), manufactured the membrane. Wescon Materials (Wescon), General Tire's EPDM membrane system representative in the Pacific Northwest provided the necessary detailed information to install the membrane.

When the contract required shop drawings, Aleutian was to "coordinate all such drawings, and review them for accuracy, completeness, and compliance with contract

requirements...." Approval by the contracting officer did not relieve the Contractor from responsibility for errors or omissions in shop drawings, nor from responsibility for meeting the requirements of the contract. The contracting officer's approval meant only that "the general method of construction and detailing [was] satisfactory," and that the Corps would "rely upon the Contractor's certification on the shop drawing that a complete check has been made and conformance with the contract has been met."

Among the written specifications for the roof was one entitled "ELASTOMERIC ROOFING (EPDM)." This specification provided that "[m]embrane, flashing, and adhesives shall be the standard products of a single manufacturer." Likewise, "fasteners shall be of the types and sizes best suited for the purpose and shall comply with roofing manufacturer's approved instructions." Wood to which the membrane was to be attached was to be preservative-treated. Under "INSTALLATION," the contract specified that "[f]asteners fastening membrane to treated grid nailer shall be covered with 6–inch wide strips of elastomeric [membrane] flashing." Aleutian was to submit the installation details for attachment of the membrane in a shop drawing to the Corps for approval. Among other matters, Aleutian was to establish and maintain a quality control program to insure that: (1) the membrane was applied as designed, (2) tests were performed on materials, and (3) test reports were produced to verify that the materials conformed to the specifications. The test reports were to contain a certification that the materials met the specifications.

Architectural Contract Drawing A–5 showed the dimensions of the roof, the locations of vents, and bore a note that Aleutian was to install mechanical fasteners "PER MNFR. RECOMMENDATION." Also, on drawing A–5 was a handwritten statement, "NOTE ON HANGAR ROOFING: CONTRACTOR TO PROVIDE CALCULATIONS TO VERIFY THAT ROOFING FASTENING SYSTEM CAN WITHSTAND AN UPLIFT FORCE OF *80 p.s.f.*" (Emphasis in original.)[1]

The contract further specified that the layers of membrane were to be cemented together, and to the insulation, at every point with contact cement, and held in place by one-inch, membrane-covered, continuous metal battens anchored to the roof frame. The contract also contained a sheet listing climatic variations, which included yearly rainfall and snowfall, and noted that the highest wind speed ever recorded at Shemya was 139 m.p.h.

Manufacturers of roof systems advised Aleutian that the combination of high winds and humidity dictated against the use of an adhered membrane because of the length of time required to apply contact cement, and for the cement to set. Moreover, the use of contact cement would not allow the air bubbles in the membrane to be rolled out. General Tire stated, without qualification, that installation of an adhered membrane would be impossible, and would "insure disastrous results." On February 1, 1984, Queen City recommended that Aleutian use General Tire's alternative membrane system which employed "metal fastening disks" to secure a single layer of membrane to the roof substructure with adhesive only at the perimeter.[2]

Aleutian submitted Queen City's February 1, 1984 letter to the Corps on February 16, 1984 as part of a shop drawing request for a no-cost change from the fully-adhered membrane system, fastened with continuous metal battens, to a non-adhered mem-

---

1. Wind speed, in miles per hour (m.p.h.), differs from wind uplift "pressure" or uplift "force." Wind uplift is described in terms of pounds per square foot (p.s.f.). Defendant explained that it arrived at the 80 p.s.f. figure by choosing 150 m.p.h. as the maximum wind speed which could be envisioned as occurring at Shemya. The p.s.f. is derived from the m.p.h. figure using a series of calculations and American National Standards Institute (ANSI) standards for measuring and estimating wind uplift, applied to variously shaped structures.

2. Throughout the record the several parties refer to the fasteners as "disks" or "discs." For uniformity, the court will use "disks," except in direct quotations.

brane system, fastened with eight-inch round disks. Also enclosed with the February 16, 1984 shop drawing were installation instructions, samples, catalog data, shop drawings, and calculations addressing the strength of the membrane and fasteners. The calculations verifying compliance with the 80 p.s.f. requirement, and detailed installation instructions, were contained in a letter from Wescon to Queen City dated February 4, 1984. The Corps rejected the proposed change, in part, because of its expressed concern that the non-adhered membrane would billow upwards and tear in high winds. To satisfy some of the Corps' concerns with the alternative membrane system, General Tire's representative explained at a meeting that the disk edges would be turned upwards to negate any "cutting edge" so that the membrane would not tear in high winds. The representative also stated that the General Tire disk-anchored system had been used successfully in Dade County, Florida, an area prone to hurricanes and having one of the strictest building codes in the country.

On April 6, 1984, Aleutian resubmitted the proposed General Tire alternative membrane system to the Corps, incorporating by reference the enclosures in the February 4, 1984 shop drawing. Both shop drawings contained a statement signed by a representative of Aleutian which said, "I certify that the above submitted items have been reviewed in detail and are correct and in strict conformance with the contract drawings and specifications except as otherwise stated." No exception was stated. In the latter submittal Aleutian also noted that "WIND TUNNEL TEST REPORTS WILL BE FORWARDED THE WEEK OF 4/9/84"—the following week. The Corps eventually approved the use of the General Tire non-adhered, disk-anchored system, but approval was conditioned upon plaintiff supplying a five-year materials and workmanship warranty from the manufacturer, and upon verification that the membrane would withstand the 80 p.s.f. wind uplift requirement. On April 11, 1984, General

Tire offered to furnish Queen City with a five-year, "watertight" warranty for the non-adhered membrane.

On the return of the April 6, 1984 shop drawing, the Corps noted that General Tire's warranty "NEED[ED] CLARIFICATION." Specifically, the Corps objected to the warranty's exclusion of damage to the membrane due to natural disasters, including full gales.[3] The Corps wrote that "DUE TO THE WIND CONDITIONS THAT OCCUR ON SHEMYA, WHICH COULD POSSIBLY BE CONSTRUED AS GALES, AS PEAK WIND CONDITIONS GET AS HIGH AS 139 MPH—THE WARRANTY SHOULD BE WRITTEN TO COVER THE ROOF DESIGN CRITERIA OF THE CONTRACT." In a letter to Queen City dated June 20, 1984, General Tire said that "while the ... [w]arranty does take exception to certain natural disaster[s] it is totally compatible with other warranties offered by the Elasto Plastic Roofing Industry," and that the written warranty terms could not be "changed or adjusted from one job to another." The five-year warranty was never provided. Nonetheless, Aleutian eventually constructed the roof system using the General Tire non-adhered, disk-anchored membrane.

During construction, Aleutian found that the hangar roof membrane billowed in high winds and resembled "an overstuffed sofa with its buttons and everything hanging out ...," which looked as if it would explode "if you stuck it with a pin...." Reportedly, other contractors in the area also noted the strange appearance of the roof. Even after the membrane was fully installed, it continued to billow, rising three to four inches above the roof substructure.

Following the loss of the membrane, the Corps directed Aleutian to make the necessary repairs or replacement. Aleutian installed wooden battens anchored across the barrel of the roof "just about literally covering the roof in wood." Thereafter, General Tire recommended to the Corps that the wooden battens be preservative-treated

---

**3.** A full gale is winds of thirty-four to forty knots, *i.e.,* thirty-nine to forty-six m.p.h. One knot equals 1.15 m.p.h.

and covered with EPDM membrane. Aleutian removed the first set of wooden battens and replaced them with battens in accordance with General Tire's recommendation. Though the membrane continues to billow in high winds in the areas between the battens, the system has withstood the winds at Shemya. The Corps accepted the hangar for beneficial occupancy on January 16, 1985. On January 17, 1989, plaintiff filed a claim for an equitable adjustment to the contract price of approximately $482,400, representing the cost of the repair work, plus interest and costs.

■ This is plaintiff's second attempt to recover its costs for the OAMP hangar roof membrane failure. In a suit filed November 12, 1982, in the United States District Court for the Western District of Washington at Seattle, Aleutian and Queen City sued General Tire and Wescon for breach of warranty, breach of contract, negligence, and strict liability for the same damages sought here.[4]

### DISCUSSION

Summary judgment is appropriate when there is "no genuine issue as to any material fact" so that the moving party "is entitled to judgment as a matter of law." RUSCC 56(c) (1991). In evaluating a motion for summary judgment, any doubt as to whether a genuine issue of material fact exists must be resolved in favor of the non-moving party. *Adickes v. Kress & Co.*, 398 U.S. 144, 158–59, 90 S.Ct. 1598, 1609, 26 L.Ed.2d 142 (1970); *Campbell v. United States*, 2 Cl.Ct. 247, 249 (1983). When the moving party has carried its burden, the non-moving party must come forward with specific facts showing that a genuine issue for trial exists, *Matsushita Elec. Indus.*

*Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986), and may not discharge its burden by cryptic, conclusory, or generalized responses. *See Willetts v. Ford Motor Co.*, 583 F.2d 852, 856 (6th Cir.1978); *Tunnell v. Wiley*, 514 F.2d 971, 976 (3d Cir. 1975). "[When] the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Id.* 475 U.S. at 587, 106 S.Ct. at 1356 (quoting *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 289, 88 S.Ct. 1575, 1592, 20 L.Ed.2d 569 (1968)). A genuine issue of material fact is one that would change the outcome of the litigation. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 2509–10, 91 L.Ed.2d 202 (1986); *Chevron U.S.A., et al. v. United States*, 17 Cl.Ct. 537, 540 (1989), *rev'd on other grounds*, 923 F.2d 830 (Fed.Cir.1991). The court finds that there are no genuine issues of material fact, and that the case is ripe for disposition by summary judgment.

Plaintiff presented four theories for finding the government liable for the cost of permanent repairs to the Shemya hangar:

1) The roof, as constructed, met the contract specified tolerance of 80 p.s.f. uplift pressure, but failed because the storm generated uplift pressures in excess of 80 p.s.f.;

2) If the roof failed at less than 80 p.s.f. of uplift pressure, it was because of faulty specifications provided by the government. Because this was a design contract, the government is liable for breach of the implied warranty of adequacy that the specifications, if followed, would create a conforming structure;

**4.** The parties have stipulated that depositions taken in the earlier case be treated as though taken in this case, except for the depositions of Dr. Peter Irwin and Mr. E. Frank Hofmeister. In the earlier suit, the district court granted partial summary judgment in favor of defendants on the grounds that no design contract had existed between Wescon and plaintiffs. The district court held that a sales contract existed between Wescon and Queen City, and that "there was no evidence that Wescon designed the [EPDM roofing system], that it only

prepared a drawing reflecting Gencorp's [General Tire's parent company] disc array design[,]" and that Wescon was a "non-manufacturing seller." Aleutian's claim against Wescon was dismissed and its claim against General Tire was settled. Aleutian's insurer has reimbursed its losses. Aleutian never had its day in court on the potential liability of the government. Therefore, the Claims Court is not barred from considering these issues by res judicata, or collateral estoppel.

3) The government failed to disclose its "superior knowledge" of the 80 p.s.f. as a "potentially inadequate load rating"; and

4) Plaintiff is entitled to an equitable adjustment for constructing a roof—at the direction of the Corps—which exceeded the contract specifications.

Defendant offered five counter-theories to establish plaintiff's liability:

1) The specifications were performance specifications; therefore, the government offered no guarantee that satisfactory performance would result if Aleutian followed the specifications;

2) If an implied warranty of adequacy regarding the specifications did exist, plaintiff cannot recover because plaintiff was negligent in following the specifications;

3) The EPDM membrane failed at far less than the design tolerance of 80 p.s.f.;

4) Defendant's acceptance of the "non-adhered" roofing method was a variation to the contract, and was conditioned upon Aleutian providing a five-year materials and workmanship warranty. Aleutian's failure to provide the warranty vitiated defendant's acceptance; and

5) The contract placed risk of loss, even of conforming structures, on plaintiff prior to government acceptance.

The court will address first the issue of whether, as a matter of law, the contract was one of design or performance, and whether the specifications fell under an implied warranty of adequacy. *See United States v. Spearin*, 248 U.S. 132, 39 S.Ct. 59, 63 L.Ed. 166 (1918).

## I. The EPDM Roof System Specifications Were More Like Performance Than Design Specifications.

■■■ According to the classic formulation defining design and performance specifications, design specifications "set forth in precise detail the materials to be employed and the manner in which the work [is] to be performed," from which the contractor is "not privileged to deviate ..., but [is] required to follow ... as one would a road map. In contrast, typical 'performance' type specifications set forth an objective or standard to be achieved ...," requiring the contractor to exercise its ingenuity in achieving the standard of performance, in selecting the means, and in assuming a corresponding responsibility for that selection. *J.L. Simmons Co. v. United States*, 188 Ct.Cl. 684, 412 F.2d 1360, 1362 (1969). "Detailed design specifications contain an implied warranty that if they are followed, an acceptable result will be produced." *Stuyvesant Dredging Co. v. United States*, 834 F.2d 1576, 1582 (Fed.Cir.1987) (citing *United States v. Spearin*, 248 U.S. 132, 39 S.Ct. 59, 63 L.Ed. 166 (1918)). In contrast, the government does not impliedly warrant the adequacy of performance specifications. *Stuyvesant*, 834 F.2d at 1582.

■■■ Government contracts not uncommonly contain both design and performance specifications. *See Utility Contractors Inc. v. United States*, 8 Cl.Ct. 42, 50 n. 7 (1985). The application of a *Spearin* implied warranty of adequacy is appropriate when the particular contract specification in question most properly can be characterized as a design specification. *See R.E.D.M. Corp. v. United States*, 192 Ct. Cl. 891, 428 F.2d 1304 (1970); *Penguin Indus. v. United States*, 209 Ct.Cl. 121, 530 F.2d 934, 937 (1976). If the government breaches its implied warranty of adequate specifications, it is responsible for plaintiff's extra costs in performing under the defective specifications. *Austin Co. v. United States*, 161 Ct.Cl. 76, 81, 314 F.2d 518 (1963), *cert. denied*, 375 U.S. 830, 84 S.Ct. 75, 11 L.Ed.2d 62 (1963). When defendant has provided design specifications and drawings, and plaintiff persuades defendant to change them in accordance with plaintiff's ideas, plaintiff assumes the risk that performance under its proposed specifications may be impossible. In general, the party that drafts, or changes, design specifications is responsible for losses suffered by the other party due to defects in the specifications. *See Austin*, 161 Ct.Cl. at 81, 314 F.2d 518.

Parts of Aleutian's contract described the materials and methods to be used in construction of the OAMP hangar, and gave some limited detailed drawings of work plaintiff was to perform. However, crucial elements still required Aleutian's ingenuity and expertise to achieve the government's desired performance. Even though a contract may contain some design specifications, when a crucial element of a contract requires the contractor to use its own expertise and ingenuity, a *Spearin* warranty does not arise as to that element of the contract. *See Penguin*, 530 F.2d at 937. With respect, at the very least, to one crucial detail—the 80 p.s.f. uplift requirement—the court must conclude that the contract was more like a performance than a design contract. No "road map" detailed how Aleutian was to satisfy the 80 p.s.f. wind uplift requirement. Drawing A–5, the drawing pertinent to this dispute, did not show how many layers of membrane were required. Neither did the drawing make any reference to disk anchors, nor did it indicate where or how they were to be placed. The contract relied entirely on the manufacturer of the roofing system, both in the written specifications and in Contract Drawing A–5, to design and specify exactly how Aleutian would install the entire roofing system, including the membrane, to meet the 80 p.s.f. uplift pressure requirement. The contract left those determinations totally to plaintiff's ingenuity, expertise, and judgment. Aleutian was required to select a roofing manufacturer who would exercise skill and judgment in designing and providing instructions for attaching the membrane in a way that would achieve the wind uplift tolerance of 80 p.s.f.

On February 1, 1984, Aleutian received a letter from Queen City which stated that General Tire, on January 31, 1984, suggested the use of its "disk anchor system and spacing row [*sic*] 24″ apart and 36″ on center per their specification date [*sic*] and shop drawings." Queen City's letter assured Aleutian that the system would meet "the eighty miles an hour wind uplift pressure" and that the "shop drawings will show the sizes of rubber sheets and the

spacing for the disc [*sic*] including flashings at walls, curbs and at laps including any and all pertinent information." The letter concluded, stating "[h]ope this will meet with everyones [*sic*] approval as much study has been applied to arrive at the best and most workable system." Queen City's letter made abundantly clear that the manufacturer's design, not the general contract specifications, played the foremost role in determining how Aleutian was to design and build the roof system, including installation of the membrane.

Aleutian's situation is similar to the contractor's in *Penguin Indus. v. United States*, 209 Ct.Cl. 121, 530 F.2d 934 (1976). In *Penguin* the government provided detailed instructions for the construction of "ignition cartridges" for the Army, but the contract specifications and drawings were silent on how to glue the fuses to the cartridge. The court's analysis was as follows:

> While detailed specifications for the cartridges were provided, and certain quality assurance inspections were required the specifications did not spell out in detail the manufacturing processes by which the cartridges were to be fabricated. It was left to the contractor to use its own judgment, experience and know-how in determining how to manufacture certain aspects of the cartridge. Thus plaintiff construes the contract too narrowly when it contends that it had only to meet the specifications set out in the contract. The fact is it had to go beyond those specifications as, for example, in the case of devising a method of gluing the flash tube to the disk. As to this limited aspect, the contract was more like a "performance" contract than a "design" specification and, as in a performance contract, the contractor must assume responsibility for the means and methods selected to achieve the end result. In short, it had the obligation to adopt and use a process of gluing that would achieve, in a workmanlike manner, a functional cartridge.

*Penguin*, 530 F.2d at 937. (Citation omitted.)

■ In this case Aleutian convinced the Corps to conditionally allow the use of disk anchors to attach a single layer of membrane which was not adhered (cemented) to the roof system substructure; nevertheless, the specifics of meeting the 80 p.s.f. requirement using the non-adhered method were always Aleutian's responsibility. The fact that the membrane manufacturer would supply the requisite engineering details did not relieve Aleutian of its responsibility to design and install the membrane to meet the 80 p.s.f. uplift requirement. *See Austin*, 161 Ct.Cl. at 81–82, 314 F.2d 518.

■ In the absence of a detailed "road map" provided by the Corps, Aleutian cannot prevail merely by asserting that the specifications were defective. Although Aleutian is correct that the mere inclusion of a specification with performance characteristics does not change a detailed design specification into a performance specification, *R.E.D.M.*, 192 Ct.Cl. at 901–02, 428 F.2d 1304, the court cannot read *R.E.D.M.* to support Aleutian's proposition that the presence of design specifications elsewhere in the contract altered the roof system specifications and drawings from performance specifications to design specifications.

Even were the court to determine that the original "fully-adhered" roof was a design specification, a conclusion with which the court does not agree, this case is distinguishable from the typical *Spearin* implied warranty case in which plaintiff performed in accordance with detailed specifications provided by defendant, only to discover that the specifications were inadequate and "satisfactory performance" did not result. *See Ordnance Research v. United States*, 221 Ct.Cl. 641, 609 F.2d 462 (1979); *R.E.D.M.*, 192 Ct.Cl. 891, 428 F.2d 1304 (1970); *J.L. Simmons Co. v. United States*, 188 Ct.Cl. 684, 412 F.2d 1360 (1969). Rather, Aleutian's situation is governed by those cases holding that a contractor who had a hand in creating his own misfortune, cannot invoke the protection of a *Spearin* warranty. *See Bethlehem Corp. v. United States*, 199 Ct.Cl. 247, 254, 462 F.2d 1400

(1972); *Austin*, 161 Ct.Cl. at 81, 314 F.2d 518 (1963).

Aleutian's situation is also analogous to that in *Austin* where the contractor built an electronic navigation system for the Navy. There, plaintiff claimed that the specifications proposed by defendant were impossible to perform, and persuaded defendant to change the specifications based on the promise that, by following its specifications, it could meet, and even exceed, defendant's specifications. After three years of trying, under its own specifications, plaintiff failed to yield a conforming product and filed a claim for its costs, alleging it was unable to perform due to matters beyond its control. The Court of Claims held that, by suggesting the means, plaintiff assumed the risk of impossibility and, like the government, plaintiff was responsible for the designs it produced. Here, Aleutian alleged that the fully-adhered membrane specifications were impossible to perform, and convinced defendant to permit Aleutian to install a non-adhered membrane using a disk anchor attachment system designed by the roofing system manufacturer's "representative in Washington/Oregon." As was plaintiff in *Austin*, Aleutian is responsible for its alternative design. Its reliance on *North Am. Philips Co. v. United States*, 175 Ct.Cl. 71, 358 F.2d 980 (1966), and Appeal of *Radionics Inc.*, 81–1 B.C.A. (CCH) ¶ 15,011 (1981), is misplaced. In each of those cases, the government received specifications directly from a third party and provided them to the contractor. The government was held responsible for the specifications it procured from the third party as though it had created them itself. However, no amount of semantic maneuvering can transform either General Tire or its local representative, Wescon, into parties in contractual privity with the government with whom Aleutian had no contractual relationship.

The parties' own understanding of what happened, as reflected in the pleadings and affidavits, supports this interpretation of the contract. Nevertheless, Aleutian disingenuously endeavored to show that the Corps' engineers regarded the non-adhered

method of attaching the membrane to the underlayment as the Corps' own design. Aleutian cited Mr. Gianotti as speaking for the Corps when he recommended "continuing with the roof system designs we now have." Aleutian's out of context use of that quotation is grossly misleading. Mr. Gianotti was actually referring to the "fully-adhered" roof design as the one with which he was satisfied, while criticizing the "non-adhered" method requested by plaintiff.

A letter from General Tire to Queen City dated April 2, 1984, shows that General Tire relied entirely on its own judgment and experience to create a roof capable of meeting Shemya Island's severe conditions:

> Since the written specification did not agree with the details, it was clear to us that each manufacturer was to bid a system designed to meet the needs of the specific application and site conditions at Shemya. After considering all of the data available to us, we recommended a variation of the General Tire Disc Anchored E.P.D.M. system which has been designed to meet the very difficult conditions at Shemya. Since the specifications ask for the manufacturers [*sic*] reccomended [*sic*] guidelines and no system exists as the specs and details are written, our system meets the criteria set forth.

Most importantly, the letter further stated that "General Tire has designed a variation of our successful Disc Anchor System within the guidelines of its specification[s] ..." and that the system was proposed for Shemya "taking all factors into consideration." General Tire's assurance of design simply conformed to the February 3, 1984 contract between Wescon and Queen City wherein the parties agreed that "[t]he General Tire Shop Drawings will be done by Wescon...." Taken together, these documents demonstrate that, in contrast to the lack of discretion given a contractor in a design specification, Aleutian had almost unfettered discretion to interpret the specifications to design and install the membrane system. The express terms of the contract made plaintiff responsible for certifying that designs furnished by "the Con-

tractor or any of his subcontractors or suppliers at any tier" were free from defects, as Aleutian did in both shop drawings, and that the work performed under the contract conformed to performance requirements. Here, as in *Austin Co. v. United States*, 161 Ct.Cl. 76, 314 F.2d 518 (1963), *cert. denied*, 375 U.S. 830, 84 S.Ct. 75, 11 L.Ed.2d 62 (1963), and in *Penguin Indus. v. United States*, 209 Ct.Cl. 121, 530 F.2d 934 (1976), plaintiff was responsible for its design, and must assume the extra costs that resulted from its ill-conceived choice. Aleutian clearly was to design an install the membrane under a performance specification, and was responsible for providing details and engineering expertise. Because no "road map" existed, except for the one devised by itself, no recovery is possible for Aleutian under the *Spearin* doctrine of implied warranty of adequacy.

## II. Defendant Did Not Possess Superior Knowledge.

Aleutian claimed the Corps breached the contract by failing to disclose its superior knowledge that 80 p.s.f. was a "potentially inadequate" wind load rating. Aleutian further contended that defendant knew plaintiff interpreted the performance requirement as a "maximum failure load" as a roof builder would interpret it, and not as a "design load" as a wind engineer might. In essence, plaintiff asserted that the Corps stood by with knowledge that it had designed the roof to withstand an uplift factor of 80 p.s.f., with no margin of safety, and failed to speak out. Defendant asserted that the requirement represented a design load and trade usage required design of the disk anchor installation to meet, at the least, double the uplift figure as a safety factor, *i.e.*, 160 p.s.f. Aleutian's argument is belied by the record and the court need not address the fact-laden issue of industry practice.

On February 1, 1984, Queen City forwarded to Aleutian, for its "review and architects [*sic*] approval," the proposed alternative General Tire EPDM, single-ply membrane system. The letter stated "[t]his system will meet the eighty miles an hour wind uplift pressure." Two days la-

ter, on February 3, 1984, Queen City and Wescon executed a purchase order obligating Aleutian to the General Tire alternative membrane system.[5] On February 16, 1984, Aleutian submitted Wescon's February 4, 1984 letter containing the calculations to verify compliance with the 80 p.s.f. wind uplift requirement. Enclosed with the letter was a shop drawing requesting deviation from the fully-adhered, batten-anchored membrane. On March 14, 1984, the Corps returned the shop drawing as unacceptable. However, the return of the February 16, 1984 shop drawing as "unacceptable" did not foreclose use of the proposed alternative membrane attachment system since Aleutian, if it so chose, was invited to address the Corps' concerns in another submittal of the General Tire membrane system. Aleutian did, in fact, resubmit the alternative membrane attachment system on April 6, 1984. Enclosed with this submittal was a March 30, 1984 letter from Queen City, previously sent to the Corps by Queen City, but not as a shop drawing, stating that if it were required to use "the 'Elasto–Metric Roofing Glue,' " Queen City would "accept no responsibility whatsoever for the current or future failure of our installation." This latter submittal also enclosed a January 31, 1984 letter from General Tire to Queen City, recommending consideration of General Tire's disk-anchored system. General Tire's January 31, 1984 letter concluded that, "[b]ased on engineering information, the following spacing should be: discs three feet on center and rows two feet apart. The Olympic screw with Enduron coating … will be used, and based on manufacturer's specifications, the systems will meet 80 pounds wind uplift pressure."

Understanding General Tire's membrane design as explained by Wescon is an important factor in resolving the superior knowledge claim. Wescon's explanation, contained in its February 4, 1984 letter, is as follows:

Attached you will find a drawing showing the spacing of the General Tire Genflex Disc Anchor System for this project on Exhibit "A". With the spacing of the disc anchors at three feet on center in rows spaced two feet apart staggered a total of 16.25 disc anchors will be required for one hundred square feet. This gives 6.16 square feet per disc to hold in place. With the information provided in the attached General Tire letter the following engineering data can be arrived at:

6.16 square feet/disc anchor × 80 pounds per square foot equals 492 pounds uplift pressure required at each disc anchor. The pull out pressure that the Olympic Fastener can withstand in treated wood is 1050 pounds which gives a safety factor of 2.13 times the requred [sic] amount.

Secondly the .060 Genflex EPDM has a tensile strength of 1300 pounds per square inch. For .060 EPDM membrane the tensile strength is 78 pounds per lineal inch. The furtherest [sic] span of membrane between edges of disc anchors is 30″ less the distance to the edge of the disc anchor of 4″ twice equals a span of 22″. Which at 78 pounds tensile strength per lineal inch gives a tear resistance of 278 pounds per square foot, a 3.47 safety factor.

The second quoted paragraph addressed the Corps' concern with the "pull out" pressure that the anchor bolts would withstand. Wescon stated that the pull out pressure of its proposed Olympic Fastener was 1,050 pounds. Using the recommended three-by-two-foot disk design array with eight-inch disks, Wescon calculated that to withstand 80 p.s.f. wind uplift pressure, each fastener would have to withstand 492 pounds uplift pressure. Because the Olympic Fastener pull out pressure was 1,050 pounds, it provided a safety factor that exceeded the 80 p.s.f. requirement by 2.13 times (1,050 divided by 492 equals 2.13). That safety factor was confirmed by Mr. Raymond Wetherholt, a licensed professional engineer and certified professional roofing con-

---

5. Contrary to both Aleutian's statements and its contractual obligations, it appears that Aleutian committed itself to the General Tire non-ad-

hered system prior to receiving approval from the Corps.

sultant, retained by Aleutian to assist in the prosecution of its claim. He concluded his affidavit by stating that Wescon's letter showed "that the roofing system met the 80 psf specification with a safety factor of 2.13, or capable of withstanding 170.4 psf wind uplift force."

The third paragraph of Wescon's letter discussed the tear resistance factor of the membrane that tore loose during the high winds on the morning of November 12, 1984. Wescon's calculations showed that, by using its anchor bolt array design, the membrane had a tear resistance factor of 278 p.s.f.—a safety factor 3.47 times in excess of the required design (278 divided by 80 equals 3.47). The calculations, provided by the representative of the membrane manufacturer and based upon data supplied by the manufacturer, were clearly intended to satisfy the 80 p.s.f. wind uplift verification requirement on Drawing A–5. Those calculations unequivocally informed Aleutian that the membrane had been designed by its manufacturer, General Tire, to withstand a wind uplift pressure of 278 p.s.f. Therefore, Aleutian's argument that it properly interpreted the 80 p.s.f. wind uplift pressure requirement as a "maximum failure load," rather than a "design load," is superfluous to the outcome of the case. The membrane was designed by General Tire, and certified by Aleutian, as capable of withstanding a wind uplift pressure up to 278 p.s.f.

Following the second submission of the General Tire membrane system, various correspondences, and a meeting notable by the absence of an Aleutian representative, the Corps, on April 10, 1984, gave conditional approval for construction of the General Tire non-adhered, disk-anchored membrane. The Corps' skepticism of the alternative system was apparent by the condition placed upon the approval requiring Aleutian to provide the United States with a five-year materials and workmanship warranty from General Tire in addition to the normal one-year warranty required by the terms of the contract. The next day, General Tire wrote a letter to Queen City which stated that if Aleutian built the non-adhered, disk-anchored roof system as de-signed, General Tire would provide the requested five-year warranty upon completion and inspection. However, General Tire's promise went unfulfilled. The only warranty the United States ever received was the one-year warranty for material, design, and workmanship required by General Provision 10 of the contract, "WARRANTY OF CONSTRUCTION."

 "Superior knowledge" is defined as knowledge that is vital to performing a government contract, but which is unknown and not reasonably available to bidders, who are thereby misled. *J.F. Shea Co. v. United States*, 4 Cl.Ct. 46 (1983). The government must disclose such superior knowledge, or be held liable for breach. *Id.* Aleutian had actual knowledge of high winds and other adverse weather conditions at Shemya Island, as demonstrated by its recommendation that the Corps deviate from its desired fully-adhered roofing system. The dispute centers not on whether defendant had superior knowledge which it failed to share with plaintiff, but on what plaintiff was expected to do with the knowledge it had.

Aleutian was given notice by Wescon's February 4, 1984 letter that the 80 p.s.f. requirement included a safety factor. Moreover, the contract clearly assigned plaintiff the burden of checking and certifying subcontractor and supplier submittals for conformance. Though the contract did not require that Aleutian be an engineering firm in order to fulfill the duties of prime contractor, Aleutian did state in its April 6, 1984 shop drawing that it would provide a wind tunnel test report. The only conclusion that the court can draw from this statement is that Aleutian did recognize the need for engineering expertise to further confirm that the membrane would meet the 80 p.s.f. uplift requirement. For Aleutian to now assert that it need not have had the alternative membrane detailed submittals checked for conformance with the contract, after it certified that it had done so, strains credulity. For Aleutian to argue that it never employed an engineer to perform wind uplift calculations, or never received an engineering re-

port from General Tire confirming that its engineering staff had properly tested the three-by-two-foot bolt design array to assure that the membrane design had a safety factor which exceeded the 80 p.s.f. requirement between 2 and 3½ times, is beyond credulity. Plaintiff may not have had the "in-house" engineering capability to independently verify the calculations, as intended by Queen City in its February 1, 1984 letter which began, "[w]e are submitting for your review and architects [sic] approval ...," but plaintiff certainly could have obtained those services. Knowledge of the need to verify the calculations was not unique to defendant. Nevertheless, the record is clear that Aleutian neither conducted a wind tunnel test nor submitted the promised wind tunnel test report to the Corps. No evidence exists that the Corps thought plaintiff's interpretation of the 80 p.s.f. specification inadequate and then concealed that information from Aleutian. Nor did Aleutian misinterpret the 80 p.s.f. requirement. Rather, Aleutian, through General Tire, interpreted the specification as the defendant expected it to be interpreted: with a significant safety factor. Because defendant did not conceal knowledge, and plaintiff, in fact, applied a significant factor of safety, plaintiff cannot prevail on a superior knowledge claim.

III. Failure To Provide The Five-Year Warranty Did Not Negate Aleutian's Right To Use The General Tire Membrane Design.

■■■ Defendant's argument that Aleutian's failure to provide the five-year materials and workmanship warranty, upon which acceptance of the non-adhered membrane was conditioned, abrogated the contracting officer's approval of that construction method, is without merit. Although the Corps was dissatisfied with the one-year warranty, it took no action to remedy its dissatisfaction and permitted Queen City to construct the roof system using the General Tire non-adhered, disk-anchored membrane system. As events transpired, the General Tire membrane failed prior to acceptance and the five-year warranty, which would have become effective only

upon completion and acceptance by the Corps of the alternative membrane system, became unnecessary.

■■■ Even assuming that Aleutian's failure to provide the five-year warranty was a breach of contract, the failure did not automatically negate the Corps' approval of the General Tire non-adhered disk-anchored membrane because the Corps failed to challenge the breach. By failing to timely object, the Corps waived that right. *See Airco, Inc. v. United States*, 205 Ct.Cl. 493, 504 F.2d 1133, 1135–37 (1974); *Ling–Temco–Vought, Inc. v. United States*, 201 Ct.Cl. 135, 475 F.2d 630, 636–39 (1973); *Northern Helex Co. v. United States*, 197 Ct.Cl. 118, 455 F.2d 546, 551 (1972); *DeVito v. United States*, 188 Ct.Cl. 979, 413 F.2d 1147, 1153–54 (1969); *Acme Process Equip. Co. v. United States*, 171 Ct.Cl. 324, 347 F.2d 509, 515–16 (1965), *rev'd on other grounds*, 385 U.S. 138, 87 S.Ct. 350, 17 L.Ed.2d 249 (1966). Under a reasonable application of the election or waiver doctrine, any act indicating an intent to continue the contract is an election, and an election to continue may occur simply by the injured party's failure to take action to end the agreement within a reasonable time after becoming aware of the facts. 5 S. Williston, *A Treatise on the Law of Contracts* §§ 683–85 (3d ed. 1961); 17A Am.Jur.2d *Contracts* § 731 (1991). Under that view, if performance continues, the right to end the contract cannot be preserved even by explicit expression of intent by the injured party. Any inconsistent act would result in the loss of the right unless the breaching party assented to the aggrieved party's retention of the right. 5 Williston, *supra*, §§ 683–85. Continuance of the contract is the most common and clearest case of waiver. *See, e.g., Cities Serv. Helex, Inc. v. United States*, 211 Ct.Cl. 222, 543 F.2d 1306 (1976).

IV. Disagreement Of Wind Speed When The Roof Failed Does Not Preclude Summary Judgment.

■■■ Dr. Isyumov, Aleutian's wind-engineer expert witness, and Dr. Perry, defendant's counterpart expert, did not agree on

the wind speed and uplift pressure at the time the membrane failed; however, they did agree that the determination of wind uplift force and speed, at any moment and place, are subjective because of variable factors. For example, anemometers located at different sites on Shemya Island rendered different wind speed readings because of differences in calibration, height, and surrounding terrain. An eyewitness reported that when the membrane began to fail, the wind speed was approximately 50 knots (57.5 m.p.h.), but that, at best, was an estimate. Dr. Isyumov opined that the reported physical destruction around the air base as a result of the storm was consistent with a higher wind speed. According to defendant's expert, Dr. Perry, this wind speed produced uplift forces between 23 and 26 p.s.f., far below the contract requirement of 80 p.s.f., but could have produced uplift forces as high as 65 p.s.f. in strong gusts. Plaintiff's expert, Dr. Isyumov, calculated that the winds must have been much higher, and would have produced uplift pressures which ranged from 90 to 100 p.s.f.

Dr. Isyumov, whose reports largely critique Dr. Perry's deposition, reported that four anemometers were present on Shemya Island. Although Dr. Isyumov stated that two anemometers were located, respectively, at the east and west ends of the main runway, and a third at the distant Rocket Sonde Facility on the south shore of the Island, he did not know where the fourth was located or whether it was in working order. Dr. Isyumov concluded that the anemometer at the east end of the runway broke "near the height of the storm." Dr. Perry said the anemometer at the west end of the runway was the one that broke. Dr. Perry based his conclusion on his calculations and reports of the National Climatic Center in Asheville, North Carolina. Dr. Isyumov's conclusion was based on his calculations, "best estimates of the wind speed during the ... storm and aerodynamic data for hangars which have since become available from wind tunnel studies," and "witness testimony." Dr. Isyumov reported that the east anemometer recorded gusts as high as 82 m.p.h. before it broke,

and the west anemometer recorded a gust of 90 m.p.h., approximately thirty to forty-five minutes after the membrane failed, but that in his opinion, those speeds are suspiciously low "given the tendency of [an unidentified] recorder not to fully register extreme gusts." He also admitted that his task was complicated by the fact that the topography of Shemya Island had changed since the November 11–12, 1984 storm. Although an eyewitness reported that the anemometer at the distant Rocket Sonde Facility recorded winds as high as 104 m.p.h. three to four hours after the membrane failed, neither party provided an analysis of the uplift factor that could have been produced by winds at that speed. Both experts did agree that the Rocket Sonde anemometer was not near the OAMP hangar and that the topography around the anemometer was so different that it would register different wind speeds than would an anemometer near the hangar.

Neither party dealt in detail with the tearing of the membrane on the morning of November 12, 1984. The record contains several general observations made during the storm, and statements in after-event analyses that the billowing membrane bent and broke anchor bolts. The membrane then ripped over an expanding area as winds continued to billow the membrane upwards, with more lateral wave-like motions, forcing the membrane against the sides of more anchors, eventually loosening and breaking them. The lateral "waves" of the membrane are clearly shown in the videotape furnished by the Corps.

The record indicated that the highest winds occurred after the membrane failed. Based upon best available estimates of likely aerodynamic coefficients, and a peak gust wind speed of 90 m.p.h., which occurred after failure of the membrane, Dr. Isyumov theorized that the "peak local uplift [was] likely to have been in the range of 90 to 100 PSF." To reach his estimated figures, Dr. Isyumov assumed that air pressure inside the hangar, flowing up through the metal decking and insulation roof substructure, contributed significantly

to the billowing of the membrane. He assumed a .90 internal pressure coefficient, which constituted nearly complete communication of the internal pressure to the membrane, but gave no explanation of how he arrived at that figure. The record is devoid of any indication that the metal roof substructure decking and insulation beneath the membrane shifted or moved in any manner during the storm. Defendant argued that the only way significant pressure could have existed inside the hangar would be if the doors were open, which they were not. Nor did Aleutian contend that they were. Nor did Aleutian provide any probative or colorable evidence that substantial internal pressure could even be communicated through the roof metal decking and insulation substructure, much less the nearly complete communication necessary to justify the .90 coefficient used in Dr. Isyumov's formula. Dr. Perry used a .25 internal pressure coefficient in his calculations which led the Corps to conclude that the highest wind gusts during the storm could have produced an uplift force of 65 p.s.f. Undoubtedly, internal pressures contributed in some small manner when the OAMP hangar doors were open. Mr. Raymond Wetherholt stated in his affidavit that:

> While standing on the OAMP roof [while final repairs were being made to the roof], I observed the roof pillowing. The pillowing increased when the hangar doors were opened, suggesting to me that internal pressure was passing to the underside of the EPDM roofing system. This suggests to me that the EPDM roofing system was subjected to both external and internal uplift when the wind blew.

It was only by use of a .90 internal pressure transmittal coefficient during a 90 m.p.h. wind gust that Dr. Isyumov could conclude that the uplift pressure on the membrane was between 90 and 100 p.s.f. In the absence of data reasonably supporting or explaining the .90 internal pressure coefficient, Dr. Isyumov's estimated uplift pressure is not probative and, therefore, cannot raise a genuine issue of material

fact. *Liberty Lobby, Inc.*, 477 U.S. at 249–50, 106 S.Ct. at 2511.

Based upon Dr. Isyumov's calculations Aleutian argued that the membrane did meet the 80 p.s.f. requirement and failed because the uplift force on the membrane at the time of failure was in excess of 80 p.s.f. Even if this were the case, which has not been shown, the court has already found that Aleutian bore sole responsibility for the design and installation of the membrane. According to Aleutian's contractor, General Tire, the anchor bolts were designed to withstand an uplift factor of 170.4 p.s.f., and the membrane had a tear resistance factor of 278 p.s.f. Whether the membrane tear resistance factor was equal to its uplift tolerance is uncertain, but clearly Aleutian accepted those calculations when it certified that the membrane would meet the 80 p.s.f. wind uplift requirement.

The court has studied the record thoroughly and concludes that the dispute between the parties as to the wind speed and uplift factors at play on the roof at the time the membrane tore loose does not present a genuine issue of material fact which would change the outcome of this case. To show that a material fact is genuinely at issue, the non-movant must do more than present "some" evidence on the disputed issue. *Liberty Lobby, Inc.*, 477 U.S. at 248–50, 106 S.Ct. at 2510–11. As the Supreme Court stated, "[T]here is no issue for trial unless there is sufficient evidence favoring the non-moving party for a [court] to return a verdict for that party. As Aleutian's evidence is at best merely colorable, and certainly not significantly probative, summary judgment may be granted." *Id.* at 249–50, 106 S.Ct. at 2510–11 (citations omitted). *See also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986), which held that "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial'". Aleutian must do more than merely raise some doubt as to the existence of a fact; it must furnish some credible evidence sufficient to require trial on the merits. *Avia Group Int'l, Inc. v.*

*L.A. Gear California, Inc.*, 853 F.2d 1557, 1560 (Fed.Cir.1988). The Corps need not "produce evidence showing the absence of a genuine issue of material fact," but may merely show the court an absence of credible evidence to support Aleutian's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986).

The government claimed that the membrane failed at less than the design tolerance of 80 p.s.f. Based on the manufacturer's assurances, and Wescon's calculations that it would withstand a wind uplift pressure several times the 80 p.s.f. requirement, Aleutian opted to construct and install General Tire's non-adhered, disk-anchored membrane. Aleutian now asks the court to find the design defective—that the membrane actually could only withstand an uplift pressure of 80 p.s.f., or less—and that the fault lay with the Corps' design. General Tire demonstrated its understanding of the 80 p.s.f. requirement by designing the membrane with a safety factor large enough to withstand an uplift tolerance of at least twice that figure. Even Dr. Isyumov agreed in his report that plaintiff would have incorporated an unspecified safety factor into the membrane design. However, Aleutian did not show by any credible evidence or argument that the uplift pressure on the membrane, at the time it tore, was as high as 80 p.s.f. Whether the wind was strong enough to create an uplift pressure of 90 to 100 p.s.f. at some point in time after the membrane tore is irrelevant. Moreover, Dr. Isyumov's calculations purporting to show a wind uplift as high as 100 p.s.f. were totally dependent upon an unsupported internal pressure factor, without which the uplift would be, admittedly, far less. Thus, Aleutian "should not be entitled to put [its] opponent to trial on the merits...." *Id.* at 1192. In responding to defendant's motion for summary judgment, Aleutian has failed "to produce any evidence, direct or circumstantial ... that might create an inference in [its] favor." *Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1192 (5th Cir.1986). Aleutian has not factually disputed any statement in defendant's motion for summary judgment. As Aleutian's arguments are

neither colorable nor probative they do not raise a disputed fact sufficient to alter the outcome of the case.

## V. Aleutian Is Not Bound By Testimony It Presented In The District Court Proceedings.

■ At the district court proceedings, Aleutian submitted the depositions of two expert witnesses: Dr. Peter Irwin and Mr. E. Frank Hofmeister. Dr. Irwin stated that, at the time of the membrane failure, the maximum wind load on the roof was 35 p.s.f. Mr. Hofmeister analyzed Wescon's calculations and stated that, because of unbalanced uplift pressure on the screws used to secure the anchor disks, the membrane would have failed at 66 p.s.f. Obviously, this court's use of either deposition would be fatal to Aleutian's case since both show that Aleutian's design was defective.

> As a general rule the pleading of a party made in another action, as well as pleadings in the same action which have been superseded by amendment, withdrawn or dismissed, are admissible as admissions of the pleading party to the facts alleged therein, assuming of course that the usual tests of relevancy are met.

*Continental Ins. Co. of N.Y. v. Sherman*, 439 F.2d 1294, 1298 (5th Cir.1971). Such prior pleadings represent either an exception to the hearsay rule or, alternatively, they meet the requirements for admissable hearsay.

Aleutian contended that Dr. Irwin's and Mr. Hofmeister's testimony from the district court litigation was inadmissable hearsay, and that in light of liberal pleading and joinder rules, a former inconsistent plea cannot be used as evidence in the trial of a conflicting plea. *Sherman*, 439 F.2d at 1298; *Nichols v. Barwick*, 792 F.2d 1520, 1523 (11th Cir.1986). This exception to the general rule includes complicated joinder situations which involve the contingent liability of third parties. *Sherman*, 439 F.2d at 1298. Aleutian argued that because it could not have joined the government in its action against General Tire and Wescon, this court should treat different factual positions as if they were alternative

claims in the same suit, as expressly allowed under RUSCC 8(e). Also, plaintiff argued that the court must prevent defendant from turning a shield into a sword, *i.e.*, preventing defendant from using the same rule that prohibited joinder of the government at the district court level to now bind plaintiff to Dr. Irwin's testimony, thus "weakening" its "alternative claim" against the government. If Aleutian could have joined the government as a defendant in the Seattle litigation, it would have needed to choose between presenting Dr. Irwin's testimony that the uplift pressure was 35 p.s.f. at the time of failure, or Dr. Isyumov's testimony that uplift pressures exceeded 80 p.s.f.[6]

■ Defendant argued that Aleutian must be bound by the earlier testimony, reasoning that had Aleutian presented both experts' opposing views in the first litigation, the testimony could have been used against plaintiff. In the same suit, "judicial admissions" may be used against the pleader by adversaries to establish a given fact as indisputable. *E.C. McAfee A/C Bristol Metal Indus. v. United States*, 832 F.2d 152, 154 n.* (Fed.Cir.1987); *Handel v. United States*, 16 Cl.Ct. 70, 74 (1988). However, Aleutian's inconsistent expert deposition testimony is not like a pleading in the alternative or an admission in pleadings in the same suit. A more applicable doctrine to govern the effect given to Dr. Irwin's and Mr. Hofmeister's testimony is that of "preclusion of inconsistent positions," or "judicial estoppel." While Moore refers to judicial estoppel as one of "rather vague outline," 1B J. Moore, J. Lucas & T. Currier, *Moore's Federal Practice*, ¶ 0.405[8], at 239 (2d ed. 1991) [hereinafter 1B *Moore's Federal Practice*], the United States Court of Appeals for the Federal Circuit has dealt with this issue extensively, and has provided standards for applying judicial estoppel. *See Water Technologies*

*v. Calco, Ltd.*, 850 F.2d 660, 665–66 (Fed. Cir.1988); *Jackson Jordan, Inc. v. Plasser Am. Corp.*, 747 F.2d 1567, 1578–80 (Fed. Cir.1984).

■ Many jurisdictions have recognized that "a litigant is not completely free to argue whatever state of facts seems advantageous at a point in time, and a contradictory state [of facts] whenever self-interest may dictate a change." 1B *Moore's Federal Practice, supra,* ¶ 0.405[8], at 240. The goal of "judicial estoppel" is to prevent litigants from "playing fast and loose" with the courts, to protect judicial integrity, *see Scarano v. Central R.R. of New Jersey*, 203 F.2d 510, 513 (3d Cir.1953), and to "avoid unfair results and unseemliness." *Jackson Jordan*, 747 F.2d at 1579 (quoting Wright, Miller & Cooper, *Federal Practice and Procedure: Jurisdiction*, § 4477, at 779 (1981)).[7] Unlike res judicata or collateral estoppel, preclusion by judicial estoppel "is not based upon [the] finality of judgments." 1B *Moore's Federal Practice, supra,* ¶ 0.405[8], at 239.

■ As decided in the Federal Circuit, the application of judicial estoppel is unwarranted when the following four factors are present: (1) no "judicial acceptance" of the previously asserted inconsistent position has taken place; (2) no risk of inconsistent results; (3) no effect of the pleading party's actions on the integrity of the judicial process; and (4) no perception that the court has been misled. *Water Technologies*, 850 F.2d at 665–66. The Federal Circuit also requires reliance by the opposing party, and prejudice to the opposing party's case as a result of the inconsistent position. *Jackson Jordan*, 747 F.2d at 1579–80. Most importantly, the party against whom estoppel is invoked must have "received some benefit from the previously taken position, i.e., [it] 'won' because of it...." *Id.* at 1579.

6. Of course, plaintiff did not have this choice in the Seattle suit. Defendants there, General Tire and Wescon, already had hired Dr. Isyumov to testify that the roof failed at greater than 80 p.s.f., in opposition to Dr. Irwin.

7. Thus, plaintiff in *Scarano*, who recovered $37,000 from his employer after alleging "total disability" as a result of a job related injury, was estopped from maintaining a suit for re-instatement less than a month later in which he alleged that he had made a physical recovery.

Applying the Federal Circuit's standard, defendant may not invoke judicial estoppel against Aleutian. In presenting factually inconsistent testimony in separate trials on the same issues, Aleutian may have acted in an unseemly and self-serving manner, and may have appeared to be "playing fast and loose" with the courts, but defendant could not technically have relied on Dr. Irwin's or Mr. Hofmeister's deposition testimony, or be prejudiced thereby, because the United States was not a party to that suit. Furthermore, the district court, apparently, was not misled and Aleutian did not profit from Dr. Irwin's or Mr. Hofmeister's testimony in the Seattle litigation, as it did not "win" there. If the party against whom estoppel is sought did not "win," the position was not "successfully asserted" and estoppel is inapplicable. *See Edwards v. Aetna Life Ins. Co.,* 690 F.2d 595, 599 (6th Cir.1982). Because several key elements of judicial estoppel are not present in this case, the court cannot estop Aleutian from pleading that uplift pressures produced during the storm exceeded 80 p.s.f., per Dr. Isyumov.[8]

## VI. Plaintiff Is Liable For Pre–Acceptance Roof Failure.

 The record is clear that the membrane failed before the government accepted the Shemya OAMP hangar. Defendant argued that under General Provision 10(a) of the contract, entitled "INSPECTION AND ACCEPTANCE," it had the right to order plaintiff to repair or replace the torn membrane, at plaintiff's expense. Provision 10(a) provided that "[n]o inspection or test by the Government shall be construed as constituting or implying acceptance. Inspection or test shall not relieve the Contractor of responsibility for damage to or loss of the material prior to acceptance...." Additionally, paragraph 12 of the General Provisions, the Permits and Responsibilities Clause, made Aleutian responsible for "all materials delivered and work performed until completion and ac-

ceptance of the entire construction work, except for any completed unit of construction thereof which theretofore may have been accepted."

The United States Court of Claims, explained the import of the Permits and Responsibilities Clause:

The Permits and Responsibilities [clause] essentially places the responsibility for 'all materials delivered and work performed' on the contractor until such time as the project is completed and accepted by the Government. As between the contracting parties, the crucial function of the article is allocation of risk. There is nowhere in the article a provision for a contract adjustment in the event that work or materials are damaged or destroyed.

*Edward R. Marden Corp. v. United States,* 194 Ct.Cl. 799, 442 F.2d 364, 368 (1971). Therefore, the risk of loss of the membrane prior to acceptance remained upon Aleutian.[9] Because defendant had the right under the contract to order Aleutian to rebuild the roof at Aleutian's expense, Aleutian is not entitled to the costs it incurred in replacing the membrane unless, as Aleutian claims, defendant ordered it to construct a roof that exceeded contract specifications, *i.e.,* designed to withstand a wind uplift pressure greater than 80 p.s.f. Aleutian's argument that it was not responsible for repairing the roof because General Tire's membrane conformed to the requirements of the contract simply restate Aleutian's position that the specifications were design specifications and, therefore, covered by a *Spearin* warranty of adequacy, an argument this court has rejected.

 Originally, the Corps directed Aleutian to replace the missing and broken disk anchors and to repair the torn membrane. Oddly enough, Aleutian objected on the basis that the membrane would again fail and, instead, installed one-by-six-inch

---

8. The court notes for the record that it used neither Dr. Isyumov's nor Mr. Hofmeister's deposition testimony from the district court proceeding in deciding this case.

9. The court surmises that, for this very reason, Aleutian insured the project and was compensated for its loss.

continuous, untreated wooden battens attached every twenty-four inches on top of the membrane and over the barrel of the roof. The Corps acceded to Aleutian's continuous-batten attachment "fix." This, however, was never considered by the Corps to be the "final fix" even though the roof withstood a "three (3) day storm with peak gusts exceeding 100 mph." After installation of the untreated battens, the Corps reported that it awaited "additional proposals from the contractor for [the] final repair work." General Tire, the roofing system manufacturer, suggested the "final fix," *i.e.*, to replace the untreated wooden battens with one-by-six-inch continuous, preservative-treated wooden battens (as the contract specifications required of all wood used in the roof substructure), and covered with EPDM membrane.

The court finds that Aleutian was solely responsible for the costs incurred in repairing the membrane. The design was plaintiff's, and regardless how often Aleutian argues to the contrary, or rephrases its argument, that fact will not change. The responsibility to provide a fully-adhered roofing system, designed by the manufacturer, was Aleutian's. Permission to install the alternative system, at no cost to the government, was granted at Aleutian's request. As did plaintiff in *Austin v. United States*, 161 Ct.Cl. 76, 314 F.2d 518 (1963), *cert. denied*, 375 U.S. 830, 84 S.Ct. 75, 11 L.Ed.2d 62 (1963), Aleutian suggested a design different from that specified in the contract. In submitting the General Tire design, Aleutian assured the Corps that the alternative design would meet the 80 p.s.f. wind uplift requirement. The facts of record, though complex, are clear that the design failed even though Aleutian made costly mistakes in attempting to comply. Aleutian simply failed to meet its contractual obligations. Nor did Aleutian provide any colorable or probative evidence that it was required by the Corps to reconstruct the roof to withstand wind uplift pressures greater than the 80 p.s.f. standard. The record did not contain any design plans for the "final" General Tire roof system nor did Aleutian indicate the uplift pressure that the repaired membrane

would withstand. All that is known is that the roof has not torn off the OAMP hangar as of the date the last brief in the case was filed. The Corps did not direct Aleutian to install untreated, exposed wooden battens to temporarily repair the roof until permanent repairs could be made. That design, like the failed General Tire design, was Aleutian's. Design of the permanent repairs came from General Tire, Aleutian's subcontractor; while the Corps may have agreed with the design, it continued to rely upon Aleutian to build a roof capable of meeting the 80 p.s.f. wind uplift standard, and nothing more. Aleutian, with the Corps' approval as required by the contract, could have rejected the General Tire final roof design and proposed any other design, at a greater or lesser cost, perhaps even from another supplier, so long as it met the 80 p.s.f. requirement. That decision was Aleutian's alone and it cannot by semantic maneuvering shift either the responsibility or cost to the government.

## CONCLUSION

The contract specifications addressing the method of fastening the EPDM membrane to the roof deck were performance specifications, and no *Spearin* implied warranty of adequacy arose. "It is well settled that where one agrees to do, for a fixed sum, a thing possible to be performed, he will not be excused or become entitled to additional compensation, because unforeseen difficulties are encountered." *Utility Contractors*, 8 Cl.Ct. at 48 (citing *Spearin*, 248 U.S. at 136, 39 S.Ct. at 61). Therefore, plaintiff is not entitled to the extra costs for repairing the roof on a defective specifications theory. Even if the specifications were design specifications, plaintiff's participation in drafting the specifications would vitiate the implied warranty. *Austin Co. v. United States*, 161 Ct. Cl. 76, 314 F.2d 518 (1963), *cert. denied*, 375 U.S. 830, 84 S.Ct. 75, 11 L.Ed.2d 62 (1963); *Bethlehem Corp. v. United States*, 199 Ct.Cl. 247, 462 F.2d 1400 (1972).

Aleutian cannot transfer the risk of loss of the membrane to defendant by purporting to show, by speculative and unsup-

ported calculations, that wind uplift pressure on the membrane might have been as high as 100 p.s.f. because the membrane was designed by Aleutian's subcontractor, and certified by Aleutian, to withstand wind uplift pressures far greater than that. It is not the purpose of the court to determine why the membrane failed, nor does it presume to know. What the court has found is that Aleutian failed to present significantly probative or credible evidence to dispute defendant's case to create a genuine issue of material fact so as to require trial. *See Celotex Corp.*, 477 U.S. at 325, 106 S.Ct. at 2554; *Liberty Lobby, Inc.*, 477 U.S. at 249–50, 106 S.Ct. at 2511.

Because defendant did not withhold knowledge vital to the performance of the contract, plaintiff cannot recover on a claim of superior knowledge. The record is clear that Aleutian provided a membrane designed to withstand uplift pressures greater than 80 p.s.f. by a factor, at the very least, of two. Aleutian's argument that the Corps stood silently by with knowledge that Aleutian "misunderstood" the 80 p.s.f. requirement is neither probative nor credible, and does not create a genuine issue of material fact. Wescon's February 4, 1984 letter to Aleutian conclusively stated that the fasteners were designed to withstand a pullout pressure 2.13 times the 80 p.s.f. requirement, and that the membrane had a tear safety factor that exceeded 80 p.s.f. by a factor of 3.47.

The costs incurred by Aleutian in permanently repairing the non-adhered, disk-anchored membrane with General Tire's preservative-treated, membrane-covered, wooden batten design constituted nothing more than compliance with its contractual duty to provide a roofing system capable of meeting the 80 p.s.f. wind uplift requirement. Aleutian has not presented credible or probative evidence or argument that the Corps coerced or improperly directed Aleutian to replace the membrane with one designed to withstand a wind uplift pressure greater than 80 p.s.f. Simply because Aleutian made a costly, abortive attempt to comply with the contract before it finally succeeded, does not mean that Aleutian can

shift its higher costs to the government. The method of complying with the contract, both in the first instance, and the last, was Aleutian's. Finally, even if the first membrane plaintiff attached to the roof substructure conformed in all ways to the contract, by the plain terms of the contract Aleutian was responsible for damage to the structure which occurred before the government's acceptance.

Following a careful examination of the record, and giving the proper presumptions and preferences required by the law of summary judgment, the court finds that neither party has presented genuine issues of material fact to be tried and that Aleutian is not entitled to an equitable adjustment to the contract. Therefore, the court denies Aleutian's cross-motion for summary judgment and grants defendant's motion for summary judgment. The Clerk of the court is directed to dismiss the complaint. Costs to defendant.

IT IS SO ORDERED.